394 S.E.2d 32

**Frank BILLOTTI**

v.

**A.V. DODRILL, Jr., Commissioner of the West Virginia Department of Corrections, and Jerry C. Hedrick, Warden.**

No. 18534.

Supreme Court of Appeals of West Virginia.

March 9, 1990.

Barbara H. Fleisher, H.F. Salsbery, James A. McKowen, Hunt and Wilson, Charleston, for Frank Billotti.

Roger W. Tompkins, Atty. Gen., Thomas J. Gillooly, Deputy Atty. Gen., Attorney General's Office, Charleston, for appellees.

BROTHERTON, Justice:

On December 21, 1983, a Monongalia County Circuit Court jury found the defen-dant, Frank Billotti, guilty of three counts of first-degree murder in connection with the October 8, 1982, shooting deaths of his wife and two teenaged daughters. Billotti was sentenced to life in prison with no possibility of parole[1] on January 17, 1984.

Evidence presented at trial indicated that the defendant's wife, Carolyn, and daugh-ters, Andrea, age 16, and Francie, age 14, were shot to death with a 12–gauge shot-gun. The shootings occurred in the up-stairs hallway of the family home some-time between 10:00 p.m. and 2:00 a.m. on the night of October 8, 1982. Carolyn and Andrea were backed up against the hall-way wall opposite the master bedroom door when they were shot. Francie was shot from behind and apparently fell down face forward in the hallway.

After shooting his wife and two children, the defendant shot himself in the head. However, he awoke the following morning and called his mother, Rose Billotti, whom he asked for help. Rose Billotti then called the defendant's cousin, Samuel James "Jim" Billotti, for assistance. When Jim arrived at the defendant's home, Rose met him at the gate and told him that the defendant had shot and killed his family. Rather than call an ambulance, they agreed to take the defendant to Monongalia Gener-al Hospital. While Rose went inside to locate medical personnel to assist her son, Jim and the defendant remained outside, where the defendant told Jim, "I have wor-ried all my life that somebody was going to come up there and shoot us all. With my own hands I have did a bum job on myself. I have ruined my life. I have lost every-thing."

The defendant made a similar statement to Dominic Carpini, a paramedic who trans-ported him from Monongalia General Hos-pital to West Virginia University Medical Center. The defendant stated, "I think I killed them all. You had better send some-body out there right away. I think they are all dead." When the paramedic asked the defendant whom he had killed, he re-sponded, "My wife and daughters … I

---

1. *See* W.Va.Code § 62–3–15 (1989).

killed them. You had better send somebody out there. They are all dead." Health care professionals treating the defendant found him to be alert and responsive. Although the defendant survived, he lost his right eye as a result of the gunshot wound.

The defendant was arrested on October 14, 1982, and was subsequently indicted on three counts of first-degree murder on January 6, 1983. When the defendant was brought to trial in the Circuit Court of Monongalia County in December, 1983, his sole defense was insanity. Three psychiatrists testified that, in their opinion, the defendant did not appreciate the wrongfulness of his acts at the time of the shootings. However, all three doctors disagreed on a diagnosis of the defendant's condition and differed as well as to the effect the defendant's drug use may have had on this condition. Apparently, the doctors each developed rather divergent accounts of what actually happened on the night of the shootings, as a result of the inconsistent accounts of the events of that evening related by the defendant.

Dr. Melinda Mullins, who practices both internal medicine and psychiatry, was assigned to the psychiatric consultation service at West Virginia University Medical Center, and she was the first of the three doctors who testified at trial to actually examine the defendant. Dr. Mullins interviewed the defendant while he was recuperating from surgery, and it was her responsibility to assess the defendant for suicidal thought or intent prior to his discharge from the hospital. The defendant did not recall the entire shooting incident with this doctor. Although she did not diagnose him at the time, Dr. Mullins raised several diagnostic possibilities at trial, including atypical paranoid disorder, schizoaffective disorder, and, because the defendant claimed that he had used drugs for diet purposes, organic delusional syndrome.

Dr. Joel Allen, a psychiatrist at West Virginia University Medical Center, saw the defendant for a total of sixteen hours over a nine-month period, beginning in December, 1982. He diagnosed the defendant as a paranoid schizophrenic, finding him to be delusional and to suffer from pervasive paranoia. According to Dr. Allen, the defendant suffered from amnesia induced by the injury to the brain, which prevented him from remembering the night of the shooting. Dr. Allen also stated that it was common for people to forget bad things, even "monstrous" things. Dr. Allen testified that the defendant remembered details of the shootings only after eight sessions with him.

Dr. Wilbur Sine, who had a psychiatric and family practice in Morgantown, West Virginia, examined the defendant at the request of the State, meeting with the defendant on five occasions for a total of five and one-half hours. Dr. Sine opined that, "At the time he shot his wife and two daughters, I felt that he was in an acute psychotic state." Dr. Sine stated that he believed the defendant's paranoia began as many as four days before the shootings and was induced by his use of drugs. When asked on cross-examination about what could trigger an acute psychotic state in a person with a personality disorder, Dr. Sine responded that it could have been the defendant's use of crystalline amphetamines. Dr. Sine stated that he didn't "believe you can make the diagnosis of paranoid schizophrenia in the face of drug usage." When the State attempted to summarize Dr. Sine's opinion by stating, "... we have a person who has a little personality disorder, is going through life managing to cope with things, and, in effect, he got high on amphetamines and lost his temper?", Dr. Sine agreed, "That's a good summary of it, basically, yes."

In addition to the expert psychiatric testimony, several lay witnesses for the State testified to the defendant's seeming normalcy in the hours and days before the shooting. Jeff Nichols delivered a load of firewood to the defendant's home the morning before the shootings, and he testified to the defendant's normal behavior at that time. Janet Hertig, an employee at Nature's Garden, a greenhouse owned by the defendant, said she thought the defendant was in a bad mood when he didn't say "hello" when he came to pick his wife up

from work the evening of the shootings. Beth Ann Finley, who rented part of a house from the defendant, testified for the defense and stated that she had not noticed any different or strange behavior on the part of the defendant in the days before the shootings. As a rebuttal witness, the State called Betty Maditz, who had known the Billottis for twelve years and described herself as their best friend. Ms. Maditz had gone shopping with the Billotti family for several hours on October 2, 1982. Ms. Maditz said that she did not remember the defendant saying anything that day which was indicative of paranoid characteristics. On cross-examination, in response to the question of whether she knew the defendant was paranoid, Ms. Maditz stated, "I would say at some times he might have been."

In his own testimony, the defendant admitted to smoking marijuana daily and taking amphetamines prescribed for weight loss. The defendant related how he had been awake for three days and three nights prior to the shootings and plagued by a persistent sense of paranoia during this time. After returning home on the evening of the incident, the defendant stated that he and his wife shared some marijuana,[2] and then "the intensity of my feelings intensified." The defendant described his nervous and paranoid behavior and how "a great light about the size of a flame ... came shimmering down off the wall and lit right on our hands and sat there." When his wife suggested that they go out on an upstairs deck to get some air, the defendant says that he proceeded to pass out twice. Upon regaining consciousness the second time, he described himself as "in a frenzy." It was at this point that the defendant says he first picked up a gun. He said that later he locked himself in his bedroom and began firing a different gun.

The defendant states that he believed he was firing at "an enemy of some kind."

At the conclusion of the trial, on December 21, 1983, the jury returned a verdict of guilty on three counts of first-degree murder, and recommended that the defendant be sentenced to life in prison, without a recommendation of mercy.

Pursuant to the provisions of W.Va.Code § 58–5–1 (1966), the defendant appealed his conviction to this Court. This initial petition for a writ of habeas corpus was refused on February 14, 1985. The defendant then petitioned this Court for a writ of habeas corpus ad subjiciendum,[3] which was denied on July 2, 1986. The defendant next filed a petition for appeal with the United States District Court for the Northern District of West Virginia on October 26, 1986, and that petition was also denied.

On April 22, 1987, the defendant filed a petition for a writ of habeas corpus in the Circuit Court of Marshall County. That court ordered that the writ be granted and made returnable before the Circuit Court of Monongalia County. An omnibus hearing at which Billotti was given the opportunity to raise all possible grounds for habeas corpus relief was held on October 1, 1987. At that time, defense counsel presented oral argument on three of the ten grounds contained in the original petition. On March 5, 1988, the Honorable Larry V. Starcher, Judge of the Circuit Court of Monongalia County, issued an opinion in which he addressed each of the grounds for relief raised by the defendant and, finding no merit in the defendant's arguments, he dismissed his petition.

█ The defendant now appeals from the March 5, 1988, order and once again seeks habeas corpus relief from this Court. We grant this petition in order to address the defendant's primary assertion that it is a violation of due process of law to deny an

---

2. Although the defendant testified that he and his wife had shared a marijuana cigarette just prior to the shootings, a subsequent drug screen on Carolyn Billotti showed no evidence of marijuana use by her in the preceding seven to ten days.

3. "When issued, this writ commands one who detains another to bring such person before the court. Where the term 'habeas corpus' is used alone, it is understood to mean the writ of habeas corpus ad subjiciendum." *Rhodes v. Leverette*, 160 W.Va. 781, 239 S.E.2d 136, 140 (1977).

individual an automatic right to full appellate review when the individual has been convicted of first-degree murder and sentenced to life in prison with no possibility of parole.

The defendant argues that this Court's review of a petition for appeal is not a full and effective review of the merits of the case and thus, our procedures do not satisfy the requirements embodied in the Fourteenth Amendment of the United States Constitution and Article III, § 10 of the West Virginia Constitution that "no person shall be deprived of life, liberty, or property, without due process of law."

The United States Supreme Court has held that appellate review is not an element of due process of law, and, consequently, that there is no constitutional right to an appeal. In *McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 914, 38 L.Ed. 867, 868 (1894), the Court stated in dictum:

An appeal from a judgment of conviction is not a matter of absolute right, independently of constitutional or statutory provisions allowing such appeal. A review by an appellate court of the final judgment in a criminal case, however grave the offense of which the accused is convicted, was not at common law and is not now a necessary element of due process of law. It is wholly within the discretion of the state to allow or not to allow such a review. A citation of authorities upon the point is unnecessary.

More than sixty years later, Justice Frankfurter expressed his doubts about the existence of a constitutional right to appeal a conviction. In a concurring opinion in *Griffin v. Illinois*, 351 U.S. 12, 20–21, 76 S.Ct. 585, 591, 100 L.Ed. 891, 900 (1956), Frankfurter wrote:

The right to an appeal from a conviction for crime is today so established that this leads to the easy assumption that it is fundamental to the protection of life and liberty and therefore a necessary ingredient of due process of law. "Due process" is, perhaps, the least frozen concept of our law—the least confined to history and the most absorptive of powerful social standards of a progressive

society. But neither the unfolding content of "due process" nor the particularized safeguards of the Bill of Rights disregard procedural ways that reflect a national historic policy. It is significant that no appeals from convictions in the federal courts were afforded (with roundabout exceptions negligible for present purposes) for nearly a hundred years; and, despite the civilized standards of criminal justice in modern England, there was no appeal from convictions (again, with exceptions not now pertinent) until 1907. *Thus, it is now settled that due process of law does not require a State to afford review of criminal judgments.* (Emphasis added.)

More recently, however, in a dissenting opinion in *Jones v. Barnes*, 463 U.S. 745, 756 n. 1, 103 S.Ct. 3308, 3315 n. 1, 77 L.Ed.2d 987, 996 n. 1 (1983), Justice Brennan expressed surprise at the majority's announcement in *Jones* that "[t]here is, of course, no constitutional right to an appeal." Brennan found that the statement, "besides being unnecessary to its decision, is quite arguably wrong."

Referring to Justice Frankfurter's statements in *Griffin*, quoted above, Brennan continued:

If the question were to come before us in a proper case, I have little doubt that the passage of nearly 30 years since *Griffin* and some 90 years since *McKane v. Durston*, 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894), upon which Justice Frankfurter relied, would lead us to reassess the significance of the factors upon which Justice Frankfurter based his conclusions. *I also have little doubt that we would decide that a State must afford at least some opportunity for review of convictions, whether through the familiar mechanism of appeal or through some form of collateral proceeding.* There are few, if any, situations in our system of justice in which a single judge is given unreviewable discretion over matters concerning a person's liberty or property, and the reversal rate of criminal convictions on mandatory appeals in the state courts, while not overwhelming,

is certainly high enough to suggest that depriving defendants of their right to appeal would expose them to an unacceptable risk of erroneous conviction.

*Id.* (emphasis added).

Justice Brennan concluded that it was unlikely that a case presenting the question would ever arise, "for the very reason that a right of appeal is now universal for all significant criminal convictions." *Id.* Similarly, writing for the majority in *Griffin,* 351 U.S. at 18, 76 S.Ct. at 590, 100 L.Ed. at 899, Justice Black stated that "[a]ll of the States now provide *some method of appeal* from criminal convictions, recognizing the importance of appellate review to a correct adjudication of guilt or innocence." (Emphasis added.)

Thus, although not constitutionally required, all of the states apparently provide a mechanism for "some method of appeal" from criminal convictions, through statutory or constitutional provisions. But while appeals from criminal convictions are not constitutionally mandated, Justice Harlan, in his dissent in *Griffin,* noted that this

does not mean that a State is free of constitutional restraints in establishing the terms upon which appeals will be allowed. It does mean, however, that there is no "right" to an appeal in the same sense that there is a right to a trial. Rather the constitutional right under the Due Process Clause is simply the right not to be denied an appeal for arbitrary or capricious reasons.

*Id.* at 37, 76 S.Ct. at 599, 100 L.Ed. at 908. "Once a state provides the right to appeal ... it cannot hinder a criminal defendant's attempt to exercise that right." *Foye v. Bordenkircher,* 535 F.Supp. 1340, 1341 (1982); *see also Dowd v. United States,* 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215 (1951).

Indigency is one of the major hindrances criminal defendants have encountered in attempting to exercise the right to file an appeal. As a result, courts have examined the constitutional implications of not providing an indigent defendant various forms of assistance in filing a petition for appeal. For example, in *Evitts v. Lucey,* 469 U.S. 387, 389, 105 S.Ct. 830, 832, 83 L.Ed.2d 821 (1985), the United States Supreme Court considered whether the Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on a first appeal of right. The petitioners, relying on *McKane v. Durston,* advanced an argument that "because the Commonwealth need not establish a system of appeals as of right in the first instance, it is immune from all constitutional scrutiny when it chooses to have such a system." *Evitts,* 469 U.S. at 400, 105 S.Ct. at 838, 83 L.Ed.2d at 832.

Writing for the majority in *Evitts,* Justice Brennan stated that "[t]he right to appeal would be unique among state actions if it could be withdrawn without consideration of applicable due process norms." *Id.* As examples, Brennan cited a state's decision to institute a particular welfare program or to set policies governing parole decisions. Although such decisions are within the discretion of the State, once a welfare system is established it must be operated subject to the protections of the Due Process Clause,[4] just as parole decisions must be made in accord with the Due Process Clause.[5] *Evitts,* 469 U.S. at 401, 105 S.Ct. at 838, 83 L.Ed.2d at 833. Brennan concluded that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Id.*

An examination of our own practice of reviewing petitions for appeal reveals that, although there are "significant discretionary elements," the procedure comports with the due process requirements of both the federal and state constitutions.[6] Arti-

---

4. *See Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970).

5. *See Morrissey v. Brewer,* 408 U.S. 471, 481–84, 92 S.Ct. 2593, 2600–02, 33 L.Ed.2d 484 (1972).

6. *See* Barrow, *The Discretionary Appeal: A Cost Effective Tool of Appellate Justice,* 11 Geo. Mason U.L.Rev. 31, 40 (1988), in which the author states:

cle VIII, § 4 of the Constitution of West Virginia describes the discretionary nature of appellate review in this State:

A writ of error, supersedeas or appeal shall be allowed by the supreme court of appeals, or a justice thereof, only upon a petition assigning error in the judgment or proceedings of a court and then only after the court, or a justice thereof, shall have examined and considered the record and is satisfied that there probably is error in the record, or that it presents a point proper for the consideration of the court.

In *State v. Legg*, 151 W.Va. 401, 151 S.E.2d 215, 218 (1967), this Court recognized that "[o]ne convicted of a criminal offense is not entitled to a writ of error as a matter of right. The Constitution and statutes create an absolute right *merely to apply for a writ of error.*" (Emphasis added.) A denial of that right, however, "constitutes a violation of both federal and state due process clauses and renders the conviction void." *Carrico v. Griffith*, 165 W.Va. 812, 272 S.E.2d 235, 239 (1980).[7]

While recommending an appeal of right from trial court decisions in all but a limited category of cases, the commentary to ABA Appellate Standard 3.10[8] discusses the "essential elements" of the opportunity to be heard in appellate procedure. Although West Virginia's review process is discretionary, it nonetheless contains these so-called "essential elements":

In some jurisdictions, appellate review is provided through a procedure in which the applicant seeking leave to appeal presents a petition that is considered by a panel of the appellate court; the case is heard by the court as a whole only if the panel grants the petition. So long as the procedure for application involves the essential elements of the opportunity to be heard, this type of procedure in substance resembles that in which a matter on appeal is first heard by a division of a court and then considered *en banc*. The essential elements of the opportunity to be heard in appellate litigation are the rights to: (1) present the record of the proceedings below, (2) submit written argument in the form of briefs, (3) present oral argument except in cases where it has so little utility that it may justly be denied, and (4) thoughtful consideration of the merits of the case by at least three judges of the court. Procedures for appellate review that lack these elements do not provide a true appeal of right.[9]

In West Virginia, a petition for appeal from the judgment of a lower court must

---

Where demand on the appellate system is modest and resources are sufficient, an appeal of right is a preferred alternative to the discretionary appeal. Eight states, each of which have a court of last resort but no intermediate appellate court, provide appeals of right except in very limited circumstances. The small populations in each of these states is certainly a significant factor in permitting this approach.

The remaining states have appellate systems with some form of discretionary appeal. Twenty-six of these states have intermediate appellate courts with no discretionary appeals, assuring at least one appeal of right. Five states [Delaware, Maine, Nebraska, New Hampshire, and West Virginia], the District of Columbia, and Puerto Rico have no intermediate appellate court and retain at least some discretionary appeals to their courts of last resort. The remaining ten states have intermediate appellate courts and yet still retain some form of discretionary appeals. Thus, forty-four jurisdictions use a discretionary appeal and must confront the problems inherent in the exercise of that discretion.... (Emphasis added.)

7. *See also Wright v. Boles*, 303 F.Supp. 872 (N.D. W.Va.1969); *Pettry v. Boles*, 275 F.Supp. 744 (N.D.W.Va.1967); *State v. Eden*, 163 W.Va. 370, 256 S.E.2d 868 (1979); *Rhodes v. Leverette*, 160 W.Va. 781, 239 S.E.2d 136 (1977); *Johnson v. McKenzie*, 160 W.Va. 385, 235 S.E.2d 138 (1977); *State ex rel. Johnson v. McKenzie*, 159 W.Va. 795, 226 S.E.2d 721 (1976); *State ex rel. Bratcher v. Cooke*, 155 W.Va. 850, 188 S.E.2d 769 (1972); *State ex rel. Wright v. Boles*, 149 W.Va. 371, 141 S.E.2d 76 (1965); *State v. Bosworth*, 143 W.Va. 725, 105 S.E.2d 1 (1958); *Linger v. Jennings*, 143 W.Va. 57, 99 S.E.2d 740 (1957).

8. *American Bar Association Commission on Standards of Judicial Administration: Standards Relating to Appellate Courts* (1977).

9. *See* Marvell, *Appellate Capacity and Caseload Growth*, 16 Akron L.Rev. 43, 73–74 (1982); *see generally* Dalton, *Taking the Right to Appeal (More or Less) Seriously*, 95 Yale L.J. 62 (1985); Note, *Courting Reversal: The Supervisory Role of State Supreme Courts*, 87 Yale L.J. 1191 (1978).

be filed within eight months of that judgment. W.Va.R.A.P. 3(a). The record on the petition may include the transcript of the proceedings below, as well as any pleadings, orders, or exhibits which will "enable the Supreme Court to decide the matters arising in the petition." W.Va.R.A.P. 4(c). Oral presentation is limited to ten minutes, unless additional time is granted by the Court. W.Va.R.A.P. 5(b).

■ In order to ensure that criminal defendants are not effectively denied the right to utilize this appellate process, and thus denied their right to due process and equal protection of the law, this Court has held that the State cannot enact legislation favoring "one class of indigent defendants over any other class of indigent defendants in criminal proceedings." *Linger v. Jennings,* 143 W.Va. 57, 99 S.E.2d 740, 741 (1957). "In the enactment of a statute, the Legislature is presumed not to enact a statute which is violative of any of the provisions of the Constitution of the United States or the Constitution of West Virginia." *Id.* at syl. pt. 2.

■ Through the interpretation of Article III, § 10 and Article III, § 17 of the State constitution, this Court has recognized a constitutional right to petition for appeal in criminal cases,[10] and has also "constitutionalized" the criminal defendant's right to receive a free transcript, appointed counsel, and the effective assistance of counsel in appellate proceedings. In *State ex rel. Bratcher v. Cooke,* 155 W.Va. 850, 188 S.E.2d 769 (1972), the petitioner sought habeas corpus relief, asserting that he was denied the right to appeal his conviction as a result of his counsel's admitted failure to file a timely appeal. This Court stated in the syllabus:

> One convicted of a crime is entitled to the right to appeal that conviction and where he is denied his right to appeal such denial constitutes a violation of the due process clauses of the state and federal constitutions and renders any sentence

imposed by reason of the conviction void and unenforceable.

The right to a transcript upon request was addressed in *State ex rel. Johnson v. McKenzie,* 159 W.Va. 795, 226 S.E.2d 721 (1976), in which we expanded upon the United States Supreme Court's decision in *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and held that the denial of a trial court record to a non-indigent defendant who desires an appeal and makes a timely request violates due process of law. And, finally, the right to both a trial transcript and the effective assistance of counsel were at issue in *Rhodes v. Leverette,* 160 W.Va. 781, 239 S.E.2d 136, 145 (1977), in which this Court concluded that:

> Although the State is constitutionally obliged to appoint effective counsel to assist an indigent criminal in his appeal, once this has been done there rests some responsibility on the indigent criminal to make known to the court counsel's inaction. . . .
>
> It should be emphasized that *the constitutional right to appeal cannot be destroyed by counsel's inaction or by a criminal defendant's delay in bringing such to the attention of the court,* but such delay on the part of the defendant may affect the relief granted. (Emphasis added.)

As these cases illustrate, the criminal defendant's right to due process when petitioning for appeal has been ensured through the development of a constitutional right to free transcripts, appointed counsel, and the effective assistance of counsel. In the case now before us, the petitioner equates the right to petition for appeal, which West Virginia grants a criminal defendant both statutorily and constitutionally, with a subsequent right to full appellate review. However, neither this Court nor the United States Supreme Court has recognized that there is such a right. Nor has our State legislature created a right to full appellate review. Criminal defendants sim-

---

**10.** For further discussion on this point, *see* Lobsenz, *A Constitutional Right to an Appeal: Guarding Against Unacceptable Risks of Errone-* ous Conviction, 8 U. of Puget Sound L.Rev. 375, 377, n. 18 (1985).

ply have no *constitutional* guarantee of a full appellate review of their convictions.

■ We need not decide whether a non-discretionary first appeal of right should be granted to all criminal defendants in this State who are sentenced to life without mercy. At this point in time, West Virginia does not grant a criminal defendant a first appeal of right, either statutorily or constitutionally. Certainly, our State legislature could create a right to this type of full appellate review in specific categories of cases, if it chose to do so. However, we conclude that our discretionary procedure of either granting or denying a final full appellate review of a conviction does not violate a criminal defendant's guarantee of due process and equal protection of the law.

We reject as well the defendant's argument that his sentence of life imprisonment without the possibility of parole is unconstitutional. The defendant stresses that he is not arguing that a sentence of life imprisonment without the possibility of parole is per se unconstitutional in a murder case, but that "the severity of the sentence, coupled with the vastly different sentencing alternatives available to the jury, mandates rigorous review of the imposition of a life sentence without possibility of parole." This argument is based, at least in part, upon the defendant's assertion that he "was not given *any* review" of his conviction or sentence. As we have just explained, however, we are satisfied that West Virginia's discretionary review procedure is constitutionally sound in that it provides criminal defendants with due process and equal protection of the law.

Our first-degree murder statute, W.Va. Code § 62–3–15 (1989) states, in relevant part:

> If the person indicted for murder is found by the jury guilty thereof, and if the jury find in their verdict that he is guilty of murder of the first degree, or if a person indicted for murder pleads guilty of murder of the first degree, he shall be punished by confinement in the penitentiary for life, and he, notwithstanding the provisions of article twelve [§ 62–12–1 et seq.], chapter sixty-two of this Code, shall not be eligible for parole: *Provided, that the jury may, in their discretion, recommend mercy,* and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve.... (Emphasis added.)

"We have traditionally held that it is the mandatory duty of the trial court to instruct the jury that it may add a recommendation of mercy to its first degree murder verdict." *State v. Miller,* 178 W.Va. 618, 363 S.E.2d 504, 506 (1987). The defendant argues that pursuant to constitutional guarantees of due process and equal protection of the law, a jury cannot make the decision to recommend or withhold mercy in an arbitrary, irrational or discriminatory manner. The constitutionality of W.Va. Code § 62–3–15 was discussed by this Court in *State ex rel. Leach v. Hamilton,* — W.Va. —, 280 S.E.2d 62 (1980), in which we declared in syllabus point 1 that "[l]ife imprisonment without possibility of parole is not cruel and unusual punishment for first-degree murder."

In *Leach,* we recognized that "[t]he West Virginia first-degree murder statute leaves very little sentencing discretion to juries. A finding of guilt automatically results in a life sentence and a jury's only discretion is whether to grant parole eligibility by recommending mercy." *Id.* — W.Va. at —, 280 S.E.2d at 64. This Court did not list the factors that a jury should consider when deciding whether to recommend mercy, noting that "these are for legislative determination." *Id.* Although we stated that "we cannot conceive of any fact that defendant could introduce to convince a jury that he deserves mercy at a separate sentencing stage, that should not be introduced by him at the main trial," we did discuss some of the factors that juries are likely to take into consideration. *Id.* — W.Va. at —, 280 S.E.2d at 65.

■ In the case now before us, the defendant argues that W.Va.Code § 62–3–15 provides no guidelines for the jury and appropriate factors for jury consideration were not listed in the instruction given by

the trial court. However, in *State v. Miller,* 178 W.Va. 618, 363 S.E.2d 504 (1987), we addressed a situation in which the factors for jury consideration discussed in *Leach* had been delineated in an instruction that the defendant objected to upon appeal as having been "erroneous," "misleading and confusing." *Id.* 178 W.Va. at 620, 363 S.E.2d at 506. We stated that "[n]owhere in the opinion [*Leach*] did we suggest, much less direct, that a jury should be instructed on factors in determining whether to recommend mercy." *Id.* 178 W.Va. at 621, 363 S.E.2d at 507. Even more significantly, we noted that "[i]n jurisdictions where the decision to recommend mercy is left entirely within the discretion of the jury and is made binding on the trial court, it is uniformly held that an instruction which enumerates instances or suggests when a mercy recommendation might be appropriate is reversible error." *Id.* 178 W.Va. at 622, 363 S.E.2d at 508 (citations omitted). Thus, contrary to the argument now advanced by the defendant, we concluded in *Miller* that "an instruction outlining factors which a jury should consider in determining whether to grant mercy in a first degree murder case should not be given." *Id.* 178 W.Va. at 623, 363 S.E.2d at 509.[11]

■ The defendant also asserts constitutional error with respect to the trial court's instruction on premeditation. The defendant argues that the trial court erroneously instructed the jury that premeditation could spring into the mind of the defendant at the instant of the act, thereby obliterating the primary distinction between first and second degree murder.

The defendant's argument on this point is derived in part from our previous discussion of this intent instruction, known as the *Clifford*[12] instruction, in *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982). In *Hatfield,* we expressed our concern that "[i]t is possible from a cursory reading of this instruction standing alone to infer that premeditation and deliberation could arise at the moment of the killing and thus arguably erase the distinction between first and second degree murder." *Id.* 169 W.Va. at 202, 286 S.E.2d at 410. We then noted, however, that "[w]hen the questioned instruction ... is fitted with others in the case, the jury was apprised of the difference" where another instruction "clearly delineated the critical difference between first and second degree murder by stating that 'murder in the second degree is when one person kills another person unlawfully and maliciously, but not premeditatedly.'" *Id.*

Similarly, in this case, after receiving the first-degree murder instruction, the jury was instructed that "murder in the second degree is committed when a person kills another person unlawfully, willfully and maliciously, but without deliberation and premeditation." We declined to reverse in *Hatfield* on grounds that the *Clifford* instruction was erroneous and, once again, we will not reverse in this case.

■ Finally, we wish to briefly discuss the defendant's assertion that the trial court erred in failing to enter a judgment of not guilty by reason of insanity at the close of the State's case-in-chief or after the State's rebuttal. The defendant argues that the evidence presented in this case was inadequate to sustain a finding that the State proved sanity beyond a reasonable doubt.

In *State v. Milam,* 163 W.Va. 752, 260 S.E.2d 295 (1979), at syllabus point 2, we discussed the State's burden regarding the sanity issue:

11. The defendant argues further that the trial court erred in failing to explain to the jury the effect of a decision to withhold a recommendation of mercy. However, the jury was instructed that "[s]hould you find the defendant guilty of first degree murder without recommendation of mercy, he will be sentenced to prison for life." This instruction was followed by an explanation that a mercy recommendation would entitle the defendant to eligibility for parole after he had served ten years of his life sentence.

12. *See State v. Clifford,* 59 W.Va. 1, 16, 52 S.E. 981, 987 (1906), in which the jury was instructed as follows:

You, the jury, are instructed that to constitute a wilful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should have come into existence for the first time at the time of the killing or at any moment previously.

**58**

There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden is on the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense.

The defendant points out that in *State v. McWilliams*, 177 W.Va. 369, 352 S.E.2d 120 (1986), we held that the testimony of five lay witnesses to the seeming "normalcy" of the defendant immediately prior to the shooting was insufficient to prove sanity beyond a reasonable doubt when balanced against the testimony of one psychiatrist. Thus, the defendant maintains that in this case, lay witnesses who testified to the defendant's normal behavior were inadequate to sustain a finding that the State proved sanity beyond a reasonable doubt when three psychiatrists testified that he did not appreciate the wrongfulness of his acts. We disagree.

Although we concluded that testimony from the State's lay witnesses was insufficient to prove sanity, we emphasized in *McWilliams* that "we do not mean to say that lay testimony can never rebut expert testimony." *Id.* 177 W.Va. at 378, 352 S.E.2d at 129. "When lay witnesses testify about a person's mental condition, the following factors are to be considered: (1) the witnesses' acquaintance with the person and opportunity to observe the person's behavior; (2) the time during which the observation occurred; and (3) the nature of the behavior observed." *Id.* at syllabus point 7. However, none of the lay witnesses in *McWilliams* even knew the defendant before the shootings, and we concluded that none "had had a sufficient opportunity to observe McWilliams to enable them to testify about his mental condition." *Id.* 177 W.Va. at 378, 352 S.E.2d at 130.

We reiterated in *McWilliams* that "[T]he State's burden of proving sanity beyond a reasonable doubt does not mean that the sanity evidence must be entirely without contradictions." *Id.*, citing *State v. Kinney*, 169 W.Va. 217, 286 S.E.2d 398, 401 (1982). We found no such contradictions in *McWilliams*. The differing conclusions

reached by the three psychiatrists in this case resulted from the somewhat conflicting information supplied to them by the defendant. The effect of the defendant's admitted substance abuse was also a point of disagreement among the experts. It is the opinion of this Court that, in this case, the issue of the defendant's sanity was properly presented to the jury and there was sufficient evidence for the jury to find that the defendant was sane beyond a reasonable doubt.

 The defendant assigns several other grounds for reversal in this habeas corpus petition which we find to be without merit. This Court has recognized on numerous occasions that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. pt. 4, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979).

This Court finds no error in the proceedings below and, finding the other grounds for relief raised by the defendant in this petition for a Writ of Habeas Corpus to be without merit, we hereby affirm the judgment of the lower court.

Writ denied.