445 S.E.2d 515

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Charles WALLS, Defendant Below, Appellant.**

**No. 21691.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 19, 1994.

Decided May 27, 1994.

---

Mary B. McLaughlin, Asst. Atty. Gen., Charleston, for appellee.

Kelly Gilmore Codispoti, Public Defender, Seventh Judicial Circuit, Logan, for appellant.

PER CURIAM:

Charles Walls appeals his June 19, 1992, jury conviction in the Circuit Court of Logan County of first degree murder without a recommendation of mercy and malicious assault. The circuit court sentenced the defendant to life imprisonment for the murder conviction and to a concurrent term of two-to-ten years for the malicious assault conviction. The defendant's sole error is that the State failed to prove his sanity beyond a reasonable doubt.

The evidence shows that on the day of the murder, December 19, 1990, the defendant, age 36, was visiting the home of his mother and stepfather, Charlotte and Ernest Adkins. The defendant's sister, Diana Vance, who earlier had borrowed his car, returned it to the Adkins' house. The defendant then offered to take her to her house, and she agreed. They left about 6:00 p.m.

Later, the defendant returned to his mother's house where he ate dinner, along with his brother and stepfather. They then proceeded to the living room to watch television. The defendant left the room and returned with a hammer, which he placed next to the chair where he was seated. When his brother left the house, the defendant followed him into the kitchen to say goodbye. The defendant's mother, who had noticed him staring at his stepfather during dinner, took the hammer out of the room. She then came back into the living room.

The defendant returned to the living room and continued to watch television. Shortly thereafter, according to Mrs. Adkins, the defendant went "out of his mind." He tore the phone off the wall and hit Mr. Adkins with it. Mrs. Adkins jumped between the defendant and Mr. Adkins. The defendant hit her and knocked her into a door. She was momentarily dazed. Upon regaining her senses, she discovered that the defendant had her husband down on the floor. She jumped between them and recalled the defendant looking at her wildly and saying "this is the son of a bitch that killed my son." * He knocked his mother back against the door.

Realizing that the defendant was too strong for her, Mrs. Adkins went to the kitchen where she got the hammer. The defendant grabbed the hammer away from her as she was attempting to raise it. A struggle ensued and she wrestled him to a small couch. However, the defendant knocked Mrs. Adkins unconscious. When Mrs. Adkins regained consciousness, she escaped through a back door and went to the home of a neighbor, Perry Harvey. Once there, she begged him to shoot her son in order to save her husband. Mr. Adkins died as a result of the attack, having been beaten to death with the hammer.

The defendant left the scene of the murder. The next morning at 6:04 a.m., the defendant passed a marked Virginia state

---

* There was no evidence that the stepfather had killed the defendant's son. The defendant, who is divorced, does have a son who lives with his ex-wife.

police car while traveling south on Interstate 81. Trooper Michael Dean Spangler of the Virginia Department of Public Safety turned on his emergency lights and siren. The defendant gave a right-turn signal, pulled over to the emergency lane, and slowed down to approximately fifteen miles per hour. The defendant then gave a left-turn signal, accelerated back onto the interstate, and waved at the trooper.

A high speed chase ensued. Trooper Spangler chased the defendant at an average speed of 107 miles per hour. When the defendant became caught in traffic, he passed cars by driving on the median or in the emergency lane. The defendant was apprehended after he and Trooper Spangler approached tractor trailers in both the right- and left-hand lanes. When the defendant attempted to go around the trucks in the emergency lane, Trooper Spangler blocked his path. The defendant attempted to drive through the median, but drove over a culvert and wrecked.

After the wreck, Trooper Spangler approached the defendant and found he had injured his back and knee. Trooper Spangler informed the defendant that he would be extradited to West Virginia on a homicide charge. He then accompanied the defendant to the hospital. Trooper Spangler testified that the defendant responded appropriately to the questions he asked and appeared to recognize him as a police officer.

■ Whether the defendant is correct in his assignment of error that the State failed to prove sanity beyond a reasonable doubt depends on the sufficiency of the evidence. As this Court stated in Syllabus Point 1 of *State v. Triplett,* 187 W.Va. 760, 421 S.E.2d 511 (1992):

" 'To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.' Syl. Pt. 1, in part, *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978)."

■ In this jurisdiction, a presumption of sanity exists until a defendant presents evidence of insanity. This Court has stated in Syllabus Point 2 of *State v. Milam,* 163 W.Va. 752, 260 S.E.2d 295 (1979):

"There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden is on the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense."

■ At trial, the defendant introduced expert testimony that raised the issue of insanity at the time the acts were committed. W. Joseph Wyatt, Ph.D., a psychologist, testified to the effect that the defendant was insane at the time of the crime and did not appreciate his actions at the time. Dr. Wyatt diagnosed the defendant as suffering from paranoid schizophrenia and as a drug and alcohol abuser. He also diagnosed an antisocial personality disorder. He did not base his finding that the defendant was not criminally responsible on the antisocial personality disorder diagnosis.

Patricia Williams, M.D., a board-certified psychiatrist, testified that the defendant suffered from paranoid schizophrenia and was not criminally responsible due to his psychosis. She examined the defendant while he was in Weston State Hospital. Robert Rush, Ph.D., a court-appointed psychologist who made the initial examination of the defendant at Weston State Hospital, testified that he initially did not believe the defendant was criminally responsible. However, at the time he rendered a psychological assessment, he deferred an opinion on the defendant's criminal responsibility and recommended a reevaluation in six months. He did not perform the reevaluation.

The defendant also called Lilian Thambidurai, M.D., a board-eligible psychiatrist, who did not give an opinion in regard to the defendant's sanity. Rather, Dr. Thambidurai testified about the defendant's occasional visits at the Logan Mingo Mental Health Center. The defendant was referred to the center following abuse of cocaine and alcohol. When Dr. Thambidurai first saw the defendant in January of 1988 she felt that the defendant was in touch with reality.

Dr. Thambidurai next saw the defendant on June 7, 1989, after his release from Huntington State Hospital. It was her impression at that time that the defendant had suffered an acute psychotic episode that resulted in his hospitalization at Huntington State Hospital. He had been given two prescriptions, one for treating a psychotic illness, the other for depression and nervousness. At the defendant's visit on June 7, 1989, Dr. Thambidurai believed that he was neither paranoid nor depressed.

After seeing the defendant on February 27, 1990, Dr. Thambidurai's impression was that the defendant suffered from alcohol abuse and depression with psychotic features. She recommended that he continue with his two prescriptions. The defendant was last seen by Dr. Thambidurai on April 3, 1990. He complained of hearing voices, but she found him to be without any overt psychosis or depression. She advised the defendant to stay on the same medication.

Eguardo Rivera, M.D., a general practitioner, saw the defendant on December 18, 1990, the day before the murder, at the Logan Medical Foundation clinic. Dr. Rivera diagnosed the defendant as suffering from depression and psychosis. During the examination, the defendant was conversant and somewhat calm. The defendant knew where he was and with whom he was talking. Dr. Rivera opined there was no emergency and defendant could safely return home. He contacted Logan Mingo Mental Health Center and an appointment was scheduled for forty-eight hours later. Dr. Rivera was not asked about the defendant's state of sanity at the time he committed the crimes.

The State relies on Dr. Thambidurai's observations of the defendant during his various visits, as well as Dr. Rivera's observations the day before the murder, to support its claim that there was sufficient evidence to show the defendant was sane. Even though they did not give expert testimony on the sanity issue, their testimony had some relevance, at least the same as that of a lay person.

The State also points to the testimony of the defendant's sister, whom he had driven home the same evening as the murder. She stated that he appeared normal. A neighbor, Perry Harvey, who had known the defendant for nineteen or twenty years, testified he had frequently seen the defendant and never observed any unusual behavior.

Finally, the Virginia state trooper who arrested the defendant testified that after the arrest the defendant seemed to respond to his initial questioning in a normal fashion. He noticed no unusual behavior after the arrest.

■ We recognized in Syllabus Point 7 of *State v. McWilliams,* 177 W.Va. 369, 352 S.E.2d 120 (1986), that lay persons could give opinions as to the mental condition of a defendant:

> "When lay witnesses testify about a person's mental condition, the following factors are to be considered: (1) the witnesses' acquaintance with the person and opportunity to observe the person's behavior; (2) the time during which the observation occurred; and (3) the nature of the behavior observed."

*See also* Syllabus Point 4, *State v. Fugate,* 103 W.Va. 653, 138 S.E. 318 (1927).

In this case, there were three experts who opined that the defendant was not criminally responsible. However, Dr. Thambidurai, who had seen the defendant on several occasions over a two-year period, the last being April 3, 1990, determined that the defendant did not suffer from schizophrenia. The existence of schizophrenia was the substantial basis of the other experts' opinions that the defendant was not criminally responsible. Furthermore, Dr. Rivera testified that the defendant appeared calm and was conversant the day before the attack.

There were also observations from lay witnesses who indicated that the defendant appeared normal to them. His sister spoke about his condition immediately before the attack when he drove her home. The Virginia state trooper gave his observation of the defendant at the time he was arrested.

This case is not like *State v. Milam, supra,* where there was no testimony that rebutted the defendant's insanity testimony. Nor is it like *State v. McWilliams, supra,* where the

only evidence presented by the State consisted of several individuals who saw the defendant for a brief period shortly before he committed the homicide. Arrayed against this rather meager lay evidence in *McWilliams* was the conclusive testimony of the defendant's psychiatrist, Dr. Patricia Williams. She described his condition and diagnosed him as being a paranoid schizophrenic.

Consequently, it is the opinion of this Court that in this case there was sufficient evidence for the jury to conclude that the defendant was sane beyond a reasonable doubt. For the foregoing reasons, the judgment of the Circuit Court of Logan County is affirmed.

Affirmed.

MILLER, Justice, dissenting:

In this case, there were three defense experts—two psychologists and a psychiatrist, Patricia Williams, M.D. Each of the experts was unequivocal as to the defendant's lack of criminal responsibility. I recognize that Lilian Thambidurai, M.D., found no signs of paranoid schizophrenia. However, she never conducted any type of mental examination on the defendant nor did she give an opinion as to his sanity. Much the same problem exists in Dr. Rivera's testimony, coupled with the fact that he is only a general practitioner. I conclude that the State did not prove the defendant's sanity beyond a reasonable doubt. Therefore, I respectfully dissent.

WORKMAN, Justice, dissenting:

Regrettably, I must dissent from the majority opinion. My regret is based upon the sure belief that this Appellant is truly dangerous. This same belief obviously impacted the majority's reasoning. However, if any scintilla of intellectual honesty is to be preserved, the failure of the State to present any real evidence to refute the overwhelming defense evidence of insanity necessitates this dissenting opinion.

Upon the introduction of evidence regarding the insanity of the Appellant, the State had the burden of proving the Appellant's sanity beyond a reasonable doubt. Syl. Pt. 2, *State v. Milam,* 163 W.Va. 752, 260 S.E.2d 295 (1979). The State failed to produce a single witness, lay or expert, to testify that the Appellant was sane at the time of the attack on his stepfather. The only other person who was there at time of the attack was the Appellant's mother and she testified that the Appellant "looked at me sort of wild and he said this is the son of a bitch that killed my son." [1]

The majority's reliance on this Court's decision in *State v. McWilliams,* 177 W.Va. 369, 352 S.E.2d 120 (1986), is misplaced. Although we ruled in *McWilliams* that lay witnesses can testify regarding a person's mental condition, this rule is tempered by the requirement that the lay witness' opportunity to observe the person's behavior relevant to the incident in question must be considered as well as the nature of the observed behavior. *Id.* at 378, 352 S.E.2d at 129. While the Appellant's sister testified that his behavior prior to the incident appeared normal, she also testified that the Appellant, earlier on the same evening, told her to "give him back his powers." Given the Appellant's history of mental health problems and the uncontroverted evidence that the Appellant and the stepfather, prior to the murder, had a loving and nonconfrontational relationship with no history of any problems whatsoever, this case is factually similar to *McWilliams,* where we concluded that no sufficient reason was offered to explain the murder, other than insanity. 177 W.Va. at 378, 352 S.E.2d at 130.

The fact that the lay witnesses, as contrasted to *McWilliams,* actually knew the Appellant does not eliminate the need to examine their testimony in light of the entire evidence. Moreover, the fact that the Appellant may have appeared rational at the time he drove his sister home does not negate the fact that he may have been suffering from delusions at the time of the commission of the murder. The Appellant's mother's testimony would appear to be the most relevant lay evidence as to his state of mind at the time of the murder and her testimony de-

---

1. Since the Appellant's son was alive on the date of the attack, this would seem to indicate that the Appellant was delusional at the time of the attack.

scribes Appellant's actions and appearance as that of a crazed individual. The State clearly failed to meet its burden of establishing beyond a reasonable doubt the Appellant's sanity at the time of the commission of the crime.

The primary purpose of this separate dissent, however, is to point out that there is a crying need for review of our laws on criminal insanity. Our statutes and case law are inadequate in addressing the need for humane treatment of the insane while providing the necessary protections to the community at large. We invited the legislature back in 1986 at the time of *McWilliams* to examine the problem created by the gap in differing burdens of proof for proving insanity and for civil commitment.

> If the State fails to meet its burden and the defendant is found not guilty by reason of insanity, the State then has the burden during the involuntary civil commitment hearing to prove that the defendant is *mentally ill* by clear, cogent, and convincing evidence. The difference in the burdens of proof creates a gap through which a defendant may pass. The State may not be able to prove either that the defendant was sane at the time of the offense beyond a reasonable doubt or that he is mentally ill at the time of the involuntary civil commitment hearing by clear, cogent, and convincing evidence. As a result, a defendant who has committed a crime may neither serve time in the penitentiary nor undergo treatment at a mental institution. It would appear that some legislation is needed to fill this gap.

177 W.Va. at 379, 352 S.E.2d at 130.

We noted in *McWilliams*, the United States Supreme Court decision in *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), in which the Court upheld the constitutionality of a District of Columbia (D.C.) statute providing for automatic commitment of defendants who are found not guilty by reason of insanity. 177 W.Va. at 379, 352 S.E.2d at 130 n. 16 (citing D.C.Code § 24–301(j) (1981)). Under the D.C. statute, a defendant must prove his insanity at trial by a preponderance of the evidence. 463 U.S. at 356, 103 S.Ct. at 3045. The Supreme Court in *Jones* "upheld the automatic commitment procedure even though it allowed an insanity acquittee to remain committed for more than the maximum sentence he could have served had he been convicted, without requiring a separate civil commitment proceeding." 177 W.Va. at 379, 352 S.E.2d at 130 n. 16.

Another possible reform which has already been implemented in the federal court system, which we noted in *McWilliams*, is an alteration of the burden of proof. With the Insanity Defense Reform Act of 1984, Pub.L. No. 98–473, 98 Stat. 2057 (1984), insanity became an affirmative defense and the defendant has the burden to prove insanity at trial by clear and convincing evidence. *See* 18 U.S.C.A. § 20 (Supp.1986).[2]

Inherent in any involuntary commitment is the potential for release upon demonstration of mental condition which evidences to the treating psychiatrist that the defendant is no longer a danger to either himself or society. Where criminal defendants found not guilty by reason of insanity are concerned, standards should be developed, legislatively or otherwise, which ensure that releases are made only under extremely cautious criteria. All too often, upon release, such an individual returns to society, and either because he refuses to take the medication necessary to control his psychotic tendencies[3] or for other reasons, commits another violent crime. For these reasons, stringent conditions should be

**2.** As we explained in *McWilliams*, "[t]he rule relating to the burden of proof of insanity does not rise to a constitutional level.... Therefore, the legislature may change the judicially established burden of proof." 177 W.Va. at 379, 352 S.E.2d at 131 n. 16.

**3.** Although the record is scant on this issue, there appears to be some evidence to suggest that the Appellant's mental health is dependent on his ingestion of prescribed medication. At some point, this Court needs to examine whether voluntary refusal to take prescribed medication, resulting in criminal insanity ought to be analogized to the legal effect of an individual choosing to imbibe alcoholic beverages. Voluntary intoxication is not an affirmative defense to criminal conduct but at most can only result in the reduction of the level of intent. Voluntary refusal to take medication perhaps should be treated in a similar fashion.

imposed upon the release of such an individual.

In *Zion v. Xanthopoulos,* 178 Mont. 468, 585 P.2d 1084 (1978), the Supreme Court of Montana upheld certain conditions and struck others imposed on a defendant who had been committed following acquittal on a charge of murder on the ground of mental disease or defect excluding responsibility. While the court struck those conditions which it described as punitive in nature and likened to those imposed on convicted criminals,[4] it upheld those conditions pertaining to requiring the acquittee to maintain frequent contact with psychiatrists.[5] *Id.* at 470–78, 585 P.2d at 1086–90. The *Zion* court quoted with approval the following language from *State v. Carter,* 64 N.J. 382, 316 A.2d 449 (1973), *overruled on other grounds sub nom. State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975), as an explanation of what would qualify as acceptable post-release supervision by a probation officer: [6]

> Throughout the period of conditional release, it is imperative that the trial court maintain frequent contact with the patient and supervising psychiatrists. *To facilitate this burden of responsibility, the trial judge should require regular and continuous reports to a court appointed probation officer both from the psychiatrists to whom the patient is reporting and from the patient himself.* The court must retain jurisdiction over the proceeding. This retention of jurisdiction is essential to enable the authorities to return the patient to the state hospital for psychiatric care immediately upon being notified that some prob-

lem has arisen which jeopardizes the safety and well being of the patient or those around him. The ability of the trial judge to immediately recall the patient in a summary fashion is crucial to the court's ability to protect the public from harm.

64 N.J. at 408, 316 A.2d at 463 (emphasis supplied).

The appellate court in *Zion* was properly concerned with the ramifications of the acquittee's failure to stay on her prescribed medication and noted the following findings of the district court:

> 'Defendant is mentally ill, but her mental condition does not make her a present danger to herself or to others. The improvement in defendant's mental condition over what it was at the time of her original confinement is probably the result of her taking of the tranquilizing drug, Thorazine. Defendant's ability to maintain social control over her behavior will depend on the degree of stress imposed upon her and upon her continued use of the tranquilizing drug. Since she is not a present danger to herself or to others, she is entitled to be released. However, her release must be strictly supervised and controlled to insure that she does not regress to her previous mental state.'

178 Mont. at 477, 585 P.2d at 1089–90. The concept of conditional release appears to comport with "the court's function ... to balance protection of the public safety against the therapeutic value and humaneness of conditional release." *Carter,* 64 N.J. at 409, 316 A.2d at 464.

---

**4.** Examples of those conditions which were struck as being unconstitutional in *Zion* are the following:

> 1. Defendant does not change her place of residence without approval of the parole officer.
> 2. That the parole officer know defendant's place of residence and her place of employment at all times.
> 3. That defendant comply with the rules and regulations of the Department of Institutions, Parole Division, and that she report regularly to her parole officer as required by him.

585 P.2d at 1086–89.

**5.** Those conditions which were upheld in *Zion,* include the following:

> 1. The defendant continue her consultations at the mental health facility and continue taking such medications as are prescribed.
> 2. That defendant suffers from no regression in her mental condition which require that she be returned to the State Hospital at Warm Springs.
> 3. That defendant maintain her behavior so she is not a danger to herself or to others.

585 P.2d at 1086–90.

**6.** Despite the fact that a defendant may have been found not guilty by reason of insanity, even those conditions found overly punitive by the *Zion* court seem perfectly legitimate in that their thrust is to keep track of the individual's whereabouts for his own protection, as well as that of the community.

Simply stated, there is clearly a necessity to protect the rights and the safety, to the extent possible, of the public in cases involving the release of one who has committed violent acts while insane. Accordingly, courts should clearly signal the mental health community to be immensely cautious in determining that a violent individual is no longer a danger to others and, in the event of such release, sentencing courts should be diligent in imposing conditions to ensure that the community at large is protected.