470 S.E.2d 215

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Floyd Lee DeGRAW, Defendant Below, Appellant.**

**No. 22977.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 1996.

Decided April 8, 1996.

Victor S. Woods, Assistant Attorney General, Charleston, for the Appellee.

Scott A. Ash, Mercer County Public Defender, Princeton, for the Appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Floyd Lee DeGraw from the July 25, 1994, final order of the Circuit Court of Mercer County sentencing the Appellant to a term of life imprisonment without possibility of parole following a jury conviction of first degree murder without a recommendation of mercy. The Appellant contends that the trial court erred: 1) in permitting improper rebuttal evidence; 2) in permitting evidence of prior criminal history; 3) in transferring venue to Raleigh County; 4) in permitting lay testimony regarding shoeprints; 5) in permitting nonspecific threat evidence; and 6) in failing to direct a verdict of acquittal as to the first degree murder charge. Upon a review of the record, the parties' briefs and arguments, as well as all other matters submitted before this Court, we find that the lower court committed no error and, accordingly, affirm.

I.

On the morning of August 29, 1993, Valerie Houle discovered the naked body of her roommate, Adrianna Vaught, in the bedroom of their apartment in Princeton, West Virginia. Ms. Houle testified that she immediately fled the apartment. Dr. Samuel A. Livingstone, a forensic psychologist, testified that an autopsy of the victim revealed eighteen knife wounds including many "defensive wounds" on her forearms and three wounds to the chest, two of which pierced her heart and were the cause of her death.

Ms. Barbara White, the Appellant's mother with whom he lived, testified that her son had arrived home at about 7:00 a.m., on August 29, 1993, with a butcher knife taken from her kitchen in his hand, and blood on his shirt and pant leg. According to Ms. White, the Appellant told her that he had stabbed a woman named Adrianna. Ms. White testified that the Appellant took off his clothes and asked her to wash them. She also stated that she noticed that her son's hand was bleeding, cut between the thumb and forefinger. According to Ms. White, her son told her that he had dropped the knife in the struggle, and cut his hand when he grabbed the knife and took it away from the victim. Ms. White stated that the Appellant eventually wrapped the knife in a paper bag before he left, and told her that he planned to "throw it away." When the Appellant left her house, he indicated to her that he was going to the Huntington State Hospital for treatment.

The Appellant subsequently was arrested in the State of Michigan on a fugitive warrant and was transported back from the Detroit area to Mercer County. Detective Jerry W. Davis, Jr., of the Princeton City Police Department, who went to Michigan to help transport the Appellant back to this state, testified that when he picked the Appellant up, he noticed a cut healing on the Appellant's right hand.

Detective Davis further testified regarding the investigation of the crime scene on the morning the victim was discovered. The de-

tective stated that when he arrived at the scene, he noted that a chair was found in the hallway in front of a closed-off doorway which entered into the kitchen of the apartment. Further, the detective indicated that the transom [1] above the doorway was open and appeared to have smeared blood on the right hand side. The detective indicated that in addition to the blood found in the bedroom, blood spots were observed "beside the chair, right beside the entrance door[.]" Detective Davis testified that it was obvious that a struggle had occurred in the victim's bedroom. Detective Charles N. Poe, also with the Princeton Police Department, testified that he lifted a shoeprint off the top of the stove, as well as a partial shoeprint found in dried blood near the victim's body. He indicated that both prints appeared to be that of a tennis shoe.

Sergeant Mark W. Neal, of the West Virginia State Police and the State's latent print expert, testified that because the soles of the shoes worn by the Appellant and seized from him at the time of his arrest had no individualized characteristics in the form of cuts or scratches, he was unable to "make any positive identifications or eliminations" with regard to the tread design of the Appellant's shoes to the prints taken from the victim's apartment. The expert, however, did render an opinion that the herringbone pattern characteristic of the prints lifted from the crime scene was "consistent with" the pattern found on the Appellant's shoes.

Further, the State introduced the testimony of Howard Brent Myers, a serologist with the West Virginia State Police, who analyzed several of the blood drops taken from the crime scene. Mr. Myers testified that the polymerase chain reaction (hereinafter "PCR") [2] testing of this evidence, when compared to known blood samples taken from the Appellant and the victim, indicated that some of the blood found in the apartment was consistent with a mixture of blood from both the Appellant and the victim. He further testified, however, that the PCR testing could not conclusively identify the Appellant as a donor of the blood.[3]

Additional evidence introduced at trial included the victim's roommate's testimony that the Appellant and the victim were friends and that the Appellant would come over to their apartment from time to time to visit with the victim. The State also presented evidence that the Appellant had lived in the victim's apartment building a short time before the murder.

The Appellant relied upon the diminished capacity defense. He attempted to prove that he was too impaired by the effects of intoxication and mental illness to premeditate the victim's killing. In support of this defense, the Appellant recalled his mother, who testified that when her son arrived home on the morning of August 29, 1993, he was in a hysterical condition evinced by shaking and crying. She also testified that her son had a long history of suicide attempts, psychiatric problems and hospitalizations.[4]

The Appellant also offered the testimony of Jeff Cole and Russell Lawrence, who testified that on the day before the murder, they had been at a party where the Appellant had been drinking heavily. Moreover, according to Mr. Lawrence, the Appellant did not leave the party until between 4:00 a.m. and 4:30 a.m. the morning of the murder. These two witnesses further testified that they, along

---

1. Detective Neal described the transom as a little window. Detective Charles N. Poe, also a detective with the Princeton Police Department, testified that the transom measured 32.5 inches wide by 14.5 inches tall, and that he could have easily crawled through the transom.

2. PCR testing is a form of DNA analysis.

3. Mr. Myers did testify that, based upon the testing he conducted, he could eliminate approximately 78 percent of the population as possible donors of the combination of blood discovered at the crime scene.

4. Mrs. White stated that the Appellant had been hospitalized in the psychiatric unit of Princeton Community Hospital for about a week in June 1993 for attempted suicide. According to Mrs. White, after his release, he "was drinking all the time ... and starting to hear voices[.]" She testified that he was again hospitalized at Southern Highlands Community Mental Health Center for these symptoms about a week prior to the murder. Her testimony indicated that her son had suffered from psychological problems since the age of twelve when he "started smelling paint brush cleaner."

with the Appellant, shared two pints of grain alcohol and a liter of whiskey, chased with beer. In addition to the alcohol consumption, these witnesses testified that the Appellant also inhaled spray paint.[5]

Additionally, Robert Lohr, a pharmacist, testified regarding certain prescriptions he filled for the Appellant approximately one week prior to the murder. These drugs included: Thorazine, which is used in the treatment of manic depression; Zoloft, which is an antidepressant; Lithium Carbonate, which is used in the treatment of manic depression; Vistaril, which is an antihistamine used in the treatment of anxiety; Prinivil, which was described as a blood pressure medication; as well as Zantac and Habitrol. Mr. Lohr testified that hypothetically if someone consumed all these drugs, as well as large quantities of alcohol, huffed paint and took a couple of Percocets,[6] that person "would be stumbling everywhere, not knowing what they had in their hand" and would largely be incapable of climbing in any windows or driving a car. However, on cross-examination, Mr. Lohr admitted that to accurately estimate the effects of the Appellant's drug and alcohol abuse, he would need a precise accounting of the quantity[7] and timing of the Appellant's consumption of these substances.

Finally, Dr. F. Joseph Whelan, a psychiatrist, testified via a videotaped deposition that the Appellant suffered from bipolar disorder or manic depression, together with an antisocial personality disorder. Dr. Whelan also indicated that the Appellant told him that on the night of the crime, he had taken three Percocets, in addition to the alcohol and paint fumes he had ingested. Dr. Whelan opined that the Appellant's ability to premeditate or reflect on his actions the morning of the murder would have been "drastically affected" by the combined effects of the Appellant's pre-existing mental illness

with what he reportedly either ingested or inhaled. Further, Dr. Whelan responded that "[i]t would be consistent" to have a loss of memory or period of blackout associated with the reported alcohol and drug abuse. On cross-examination, Dr. Whelan gave a detailed account of the Appellant's statements to him regarding his inability to recall events on the morning of the murder. Moreover, Dr. Whelan answered affirmatively when questioned whether "the only blackout of any significance or prolonged blackout he [the Appellant] reported to you in his entire life, was one blackout surrounding the murder of Adrianna Vaught[.]" Moreover, Dr. Whelan testified that his opinion of the Appellant's condition on August 29, 1993, was "[p]rimarily based on what ... [the Appellant] told me."

In rebuttal, the State presented the videotaped testimony of Dr. Nusrath Hasan, a psychiatrist who had previously conducted an examination of the Appellant to ascertain his competency to stand trial. Dr. Hasan diagnosed the Appellant as suffering from major depression with psychosis rather than manic depressive disorder. Also, she indicated that the Appellant's manic behavior could have been drug-induced rather than the result of an inherent mental illness.

Additionally, Sandra Grim, a psychologist who also examined the Appellant to determine his competency, testified that one of the Appellant's test scores indicated that he was a person who tended to exaggerate his problems. Ms. Grim also testified that her records indicated that the Appellant had claimed alcoholic blackout as an excuse for "prior problems."

Finally, in attempt to rebut the Appellant's statements presented through Dr. Whelan that he had no recollection of the events which took place on the day of the murder, the State presented the testimony of Detective Davis, who stated that when he and

5. William W. Tippet, Jr., a witness for the State who was at the same party, testified that while the Appellant was consuming beer, he did not observe anyone huffing paint.

6. Dr. F. Joseph Whelan, a psychiatrist who testified on the Appellant's behalf, stated that the Appellant told him that he took three Percocets,

a medication with opium derivative normally prescribed for severe pain, on the evening before the murder.

7. The Appellant's mother testified that the Appellant thought his medication made him suicidal, and "[h]e just quit taking it."

another detective, Charles Poe, were transporting the Appellant back from Michigan, Detective Poe examined the Appellant's hand and remarked, "I know how you got that[,]" to which the Appellant responded, "You've talked to mama." [8] Further evincing the Appellant's memory of those events, Detective Davis testified that during a "casual conversation" concerning the roads on the way back from Michigan, the Appellant remarked that "the way he came up, the way he had went to Michigan, was shorter than the way we had came and was going back, and that there were no tolls there. . . ."

## II.

## REBUTTAL EVIDENCE

■ The first issue is whether the Appellant's Fifth Amendment right to remain silent was violated when the trial court admitted the Appellant's voluntary statements, which were given to police in violation of *Miranda* and, therefore, ruled inadmissible in the State's case-in-chief, as evidence to rebut his diminished capacity defense. The Appellant argues that the State was able to use the inadmissible statements to impeach him even though he never took the witness stand. In contrast, the State contends that the defense elicited an opinion from the Appellant's psychiatrist that the Appellant could have blacked out the morning he killed the victim. The State maintains that it demonstrated on cross-examination that this opinion was based largely upon the Appellant's statements to his psychiatrist. These statements, which were recited in detail to the jury, included claims that the Appellant did not remember anything from the morning of the crime. Thus, the State argues that its rebuttal, which was limited to showing that the Appellant had some recall of the events that occurred while he was allegedly blacked

out, was properly admitted to impeach the statements the Appellant made to his psychiatrist.[9]

■ The Appellant relies upon this Court's decision in *State v. Goodmon,* 170 W.Va. 123, 290 S.E.2d 260 (1981), as support for his contention that a criminal defendant's voluntary statements may be used to impeach the defendant only if the defendant takes the stand and testifies. Specifically, we held in syllabus point four of *Goodmon,* that

[w]here a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony contradicting the prior voluntary statement knowing that such prior voluntary statement is inadmissible as evidence in the State's case in chief.

*Id.* at 124, 290 S.E.2d at 262; *accord Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

In solely relying upon the *Goodmon* and *Harris* decisions, the Appellant neglects the evolution of the law since those decisions were rendered. In *James v. Illinois,* 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990), a defense witness testified that on the day of the crime, she had taken the defendant to school and, at that time, his hair was black. *Id.* at 310, 110 S.Ct. at 650–51. The defendant had given the police a statement, which the trial court had suppressed due to a Fourth Amendment violation, in which the defendant stated that on the day of the crime his hair had been reddish brown, long, and combed straight. *Id.* at 309–10, 110 S.Ct. at

---

**8.** In a pretrial suppression hearing, the trial court ruled that the Appellant's statements could not be used by the State in its case-in-chief because they were made in response to questioning prior to *Miranda* rights being given to the Appellant. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, the court found that the Appellant's responses were made voluntarily and without coercion. Moreover, the trial court ruled that it would

allow the Appellant's statements to be admitted in rebuttal, "if he testified or if some other contradictory type [of] statements [are presented] in the defenses [sic] case in chief."

**9.** We find no merit to the State's argument that the trial court erred when it ruled that the Appellant's statements were obtained in violation of *Miranda.*

650–51. The state supreme court had allowed the introduction of the defendant's statement to impeach the defendant's witness. *Id.* at 310–311, 110 S.Ct. at 650–51. In reversing the state court's decision, the United States Supreme Court refused to "expand[ ] the scope of the impeachment exception to permit prosecutors to use illegally obtained evidence to impeach the credibility of defense witness." *Id.* at 313, 110 S.Ct. at 652. The Supreme Court reasoned that while the exception covering the impeachment of a defendant's testimony "penalizes defendants for committing perjury by allowing the prosecution to expose their perjury through impeachment using illegally obtained evidence[,]" there was no such countervailing rationale supportive of the proposed expansion. *Id.* at 314, 110 S.Ct. at 652–53. In contrast, the *James* court opined that "the mere threat of a subsequent criminal prosecution for perjury is far more likely to deter a witness from intentionally lying on a defendant's behalf. . . ." *Id.* Further, the Supreme court noted a potential chilling effect that such an expansion would have on defendants presenting their case through the testimony of others, since defendants "would have to assess prior to trial the likelihood that the evidence would be admitted to impeach the otherwise favorable testimony of any witness they call." *Id.* at 315, 110 S.Ct. at 653.

Therefore, we hold that pursuant to the Supreme Court's decision in *James,* the scope of the impeachment exception pertaining to the admissibility of a defendant's voluntary, yet illegally obtained statement, does not permit prosecutors to use such statements to impeach the credibility of defense witnesses. However, the *James* decision is distinguishable from the present case because the State was offering the defendant's illegally obtained statement not to impeach a

defense witness's testimony, but to impeach the contradictory statements the defendant made to that witness.

The District of Columbia Court of Appeals addressed this identical issue in *Wilkes v. United States,* 631 A.2d 880 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 143, 130 L.Ed.2d 84 (1994). In *Wilkes,* the defendant, charged with murder, made statements to police, without being advised of his *Miranda* rights, wherein he told police where he had thrown the murder weapon, stated "I did it[,]" and described his relationship with the murder victim. 631 A.2d at 881–82. At a pretrial hearing, the trial court found the statements inadmissible due to the *Miranda* violation, but concluded that the statements were otherwise voluntarily given. *Id.* at 882. At trial, the defendant, relying on the insanity defense, introduced expert psychiatric testimony which indicated that the defendant had a mental disorder which resulted in blackouts and that at the time of the murder, he was suffering from a blackout which caused him to have no recollection of the crimes he committed. *Id.* Specifically, a psychiatrist for the defense testified that at the time of the crime the defendant " 'was in a different state of awareness such that he was not able to either control his behavior or realize all the implications of what he was doing, including the illegality.' " *Id.* at 883. The trial court permitted the prosecution to cross-examine this expert about the statements the defendant had given to police in the form of a hypothetical question "because the doctor had testified that his opinion was based in part upon . . . [the defendant's] statements to him that . . . [the defendant] lacked any memory of the events surrounding the charged offenses." *Id.* The trial court also allowed two police officers to testify about the statements made to them by the defendant in the state's rebuttal case.[10] *Id.*

10. The trial court gave the following limiting instruction after the testimony of each of the two officers who offered the defendant's statements in evidence:

'Statements of the defendant to the doctor may be discredited or impeached by showing that the defendant has previously made statements which are inconsistent with what he told the doctor.

The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of the defendant's statement to the doctor and the reliability of the opinion which the doctor based in part on those statements.

The defendant's statement to the detective is not considered as evidence of the defendant's guilt of the offense for which he is charged. You may consider it—you may not consider it, rather,

In upholding the admissibility of the defendant's statements the *Wilkes* court distinguished the Supreme Court's decision in *James* by reasoning that "the Supreme Court in *James* made clear that the holding of the case should be read as a response to a state court's effort to create an exception to the exclusionary rule so broad that it virtually swallowed the rule." *Id.* at 887. The *Wilkes* court interpreted the *James* decision "as principally rejecting an overly broad principle rather than establishing one of its own." *Id.* More significantly, the *Wilkes* court reasoned:

> as the Court emphasized in *James,* an important purpose of the impeachment exception is to discourage defendants 'in the first instance from "affirmatively resort[ing] to perjurious testimony." ' Such discouragement is best achieved here by upholding the admission of ... [the defendant's] statements. Obviously, no one can be 100 percent certain whether ... [the defendant's] apparent mental disorder is feigned or real. Nevertheless, this is probably the only situation (we can think of no other) in which the threat of a perjury prosecution is of no value. A doctor who accurately recounts what his patient has told him, and in so doing properly discloses to the fact-finder the basis for his opinion, does not commit perjury simply by relating untruths told to him by his patient. Thus this case is readily distinguishable from *James,* for example, in which the Court recognized that most defense witnesses (other than the defendant) are sufficiently deterred from committing perjury by the threat of being prosecuted for it. No analogous threat hangs over the head of a defendant who knows that his untruths will simply be relied upon and repeated to the jury on his behalf by his psychiatrist.

*Id.* at 889–90 (quoting *James,* 493 U.S. at 314, 110 S.Ct. at 652) (citation omitted).

Consequently, the *Wilkes* court held that when a defendant offers the testimony of an expert in the course of presenting an

insanity defense and the expert's opinion is based, to any appreciable extent, on statements made to the expert by the defendant, the government may offer evidence excluded under *Miranda*—either by way of impeachment (*i.e.,* during cross-examination of the expert) or in rebuttal (*i.e.,* by showing independently that the statements made to the expert were false)—for consideration by the fact-finder in assessing the expert's opinion.

631 A.2d at 890–91. As the court succinctly stated, "[w]e do not think that such a defendant should be allowed to lie to the psychiatrist and get away with it when there is evidence tending to show that he lied *and that the psychiatrist's diagnosis was based on that lie.*" *Id.* at 890.

The United States District Court for the Eastern District of New York recently expanded the concept enunciated in *Wilkes* by determining that a defendant's voluntary, yet otherwise inadmissible statements, were admissible as impeachment where any defense witness's testimony related a defendant's contradictory out-of-court statements to the jury. *United States v. Trzaska,* 885 F.Supp. 46, 49 (E.D.N.Y.1995). In *Trzaska,* the defendant, who was convicted of possessing a firearm and ammunition, made statements to a probation officer that with respect to the munitions found in his apartment, " 'I'm a drug addict with this; its [sic] a sickness[.]' " *Id.* at 47. The district court found that this statement was inadmissible as direct evidence of the crime charged due to a violation of the defendant's Fourth Amendment right. However, during the course of trial, the defendant offered the testimony of his son who relayed to the jury the defendant's out-of-court statements to him which tended to prove that the defendant was no longer involved with guns and that he was not illegally in possession of the firearms as charged. *Id.* Subsequently, the state offered the defendant's statement to his probation officer in order to impeach his out-of-court statements made to his son. *Id.*

as establishing the truth of any facts contained in it, and you must not draw any inference of guilt against the defendant just from his statements.'

631 A.2d at 884.

In allowing the defendant's illegally obtained statements in evidence, the district court reasoned that:

[t]he considerations underlying *James* are not applicable here. Unlike the *James* situation, the defendant himself is the real witness. As the Advisory Committee Note to Fed. R. of Evid. 806 aptly observes, 'the declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified.'

*Id.* at 49.

■ We agree with reasoning of the courts in *Wilkes* and *Trzaska*, that in these types of cases the real witness being impeached is not the defense witness, but the defendant. Consequently, when a defendant offers the testimony of an expert in the course of presenting a defense such as the insanity defense or the diminished capacity defense, which calls into question the defendant's mental condition at the time the crime occurred, and the expert's opinion is based, to any appreciable extent, on the defendant's statements to the expert, the State may offer in evidence a statement the defendant voluntarily gave to police, which otherwise is found to be inadmissible in the State's case-in-chief, solely for impeachment purposes either during the cross-examination of the expert or in rebuttal, even though the defendant never takes the witness stand to testify.[11] *See Wilkes*, 631 A.2d at 890–91.

The record in the present case is clear that the Appellant's illegally obtained statement was voluntarily given to police. Further, the Appellant's expert indicated that he relied, to

an appreciable degree, upon statements the Appellant made to him in rendering his opinion as to the Appellant's mental state at the time the crime was committed. Moreover, the expert relayed to the jury the Appellant's statements to him in an attempt to establish that he had no recollection of the events surrounding the victim's murder due to a black-out. It was only after this testimony that the trial court permitted the State, during its rebuttal case, to offer the Appellant's otherwise inadmissible statements which indicated that the Appellant did indeed have some memory as to the events surrounding the crime charged. Accordingly, the trial court committed no error in allowing this rebuttal testimony.

## PAST CRIMES

■ The next issue concerns whether the trial court improperly permitted evidence of the Appellant's prior criminal history to be introduced in violation of West Virginia Rules of Evidence 609(a)(1)[12] and 404(b).[13] The alleged error arises out of the following exchange during the State's cross-examination of the Appellant's expert, Dr. Whelan, during a videotaped deposition:

BY MS. GARTON [the prosecutor]:

Q: [A]fter going through his [the Appellant's] details as to his past history and problems, she [psychologist Sandra Grimm] indicated that on several occasions in the past when he had been confronted with these offenses that he would state he did not remember what had happened, and also used alcohol and drugs as an excuse.

---

11. As the court in *Wilkes* noted, "[a] defendant may still avoid admission of the suppressed evidence if he or she does not open the door by telling something to a psychiatrist that is contradicted by that evidence." 631 A.2d at 890.

12. West Virginia Rule of Evidence 609(a)(1) provides, in pertinent part, that "[f]or the purpose of attacking the credibility of a witness accused in a criminal case, evidence that the accused has been convicted of a crime shall be admitted but only if the crime involved perjury of false swearing." *Id.*

13. West Virginia Rule of Evidence 404(b) provides:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. *Id.*

MR. ASH [the Appellant's attorney]: Objection. Move to strike.

BY MS. GARTON:

Q: Okay. Would that be consistent with what he told you?

A: Well, first of all, I haven't read her reports.

Q: I understand.

A: And I don't know if I can answer that or not.

Q: No. I'm asking if that's consistent with what he told you as to this event involving the death of Adrianna Vaught?

A: Again, I really don't quite understand the—your comments. And I don't see them as questions, more like comments.

If he had a blackout and alleged a blackout to her, then it would be similar to what I believe he told me.

Q: If there were a history of problems, Doctor, and a history of being confronted with these problems, with behavioral problems with criminal activity and the excuse was always, "It was an alcoholic blackout," would that not indicate that that's exactly what it was, was an excuse—

MR. ASH: Same objection.

BY MS. GARTON:

Q: —for defense?

MR. ASH: Same objection—

THE WITNESS: I couldn't answer that without—

MR. ASH:—with motion to strike.

Now, you may answer.

THE WITNESS: I can't answer that without reviewing the records.

Prior to trial, the Appellant filed a motion objecting to the above-mentioned questions and responses thereto, stating that "the State made pointed reference to prior criminal offenses of [the] defendant" which was "a naked attempt to circumvent the rule against impeachment of a criminal defendant by pri-

or conviction (Rule of Evidence 609)." [14] The Appellant never cited West Virginia Rule of Evidence 404(b) as a supporting ground for this objection.

The trial court denied the Appellant's motion, stating that:

> I believe that the cross-examination by the State was somewhat reserved and controlled. The only reference was to criminal activity. There was no specific reference to any particular crime. I mean, criminal activity could be forged checks. I don't particularly know Mr. DeGraw's record, and I don't think it's necessary at this time. But there wasn't an emphasis that I believe that would override the probative value of that and the necessity of the State to challenge Dr. Whelan's testimony and diagnosis in the matter. I think it's necessary to do that to attempt to explain or counter the defense from the State's standpoint.

The trial court also offered to give a cautionary instruction to the jury with regard to its ruling; however, the Appellant's counsel stated that "we would not request a cautionary instruction, however, as a matter of tactic." The trial court acceded to the Appellant's counsel's request.

The Appellant argues that the trial court improperly allowed the State to interject the Appellant's bad character in evidence through a reference to the Appellant's prior criminal history during the cross-examination of his psychiatric expert. In contrast, the State maintains that the Appellant's objection under West Virginia Rule of Evidence 609(a)(1) was properly overruled since the evidence was not offered to impeach the Appellant's credibility. The State further contends that the Appellant is precluded from relying on West Virginia Rule of Evidence 404(b) as a grounds for relief under this appeal because he failed to argue the applicability of Rule 404(b) before the trial court.

---

**14.** The Appellant also argued below that the questions and answers were "contrary to the principals [sic] of *State v. Jackson*, 171 W.Va. 329, [330,] 298 S.E.2d 866 [,867] (1982)(holding that '[p]rotection of a defendant's constitutional privilege against self-incrimination ... at pretrial court-ordered psychiatric examinations, re-

quires that ... an *in camera* suppression hearing be held to guarantee that the court-ordered psychiatrist's testimony will not contain any incriminating statements')." The Appellant does not claim on appeal that such reference violated his right to silence under *Jackson*.

We agree with the State's contention that the Appellant's claim of error under Rule 404(b) is precluded from appellate review based on his failure to state this authority as ground for his objection before the trial court.[15] West Virginia Rule of Evidence 103(a)(1) provides, in pertinent part, that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the *specific* ground of objection, if the specific ground was not apparent from the context...." *Id.* (emphasis added). In interpreting the significance of Rule 103(a)(1), Justice Cleckley in his *Handbook on Evidence for West Virginia Lawyers* states: "the objecting party should not benefit from an insufficient objection if the grounds asserted in a valid objection could have been obviated had the objecting party alerted the offering party to the true nature of the objection." 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 1–7(C)(2) at 78 (3rd ed. 1994); *see Leftwich v. Inter–Ocean Casualty Co.,* 123 W.Va. 577, 585–86, 17 S.E.2d 209, 213 (1941) (Kenna, J., concurring) ("It is well established that where the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified."); 1 Jack B. Weinstein et al., *Weinstein's Evidence* ¶ 103[02] at 103–37 (1995) (stating that "a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal"); *see also United States v. Reed,* 977 F.2d 14, 16 (1st Cir.1992)

(finding that defendant failed to make timely Rule 404(b) objection to admission of prior possession of cocaine conviction where, before trial court, defendant only argued that said admission violated Rule 403); *United States v. Mascio,* 774 F.2d 219, 221–23 (7th Cir.1985) (stating that defendant cannot raise Rule 404(b) issue for first time on appeal, where objection before trial court only concerned lack of foundation and lack of specificity).

■ Consequently, the Appellant's failure to raise a Rule 404(b) objection before the trial court precludes us from reviewing his Rule 404(b) argument. We further find that the trial court did not err in refusing to suppress the testimony based on a Rule 609 objection. Rule 609 governs the admissibility of evidence offered for impeachment purposes, and the record clearly indicates that the references to the Appellant's past criminal activity were not offered to impeach his credibility, but rather to determine the basis and validity of the expert's opinion.

## THREAT EVIDENCE

■ We also address whether the trial court erred in allowing the State to introduce evidence that he threatened someone other than the victim the morning of the murder. The Appellant maintains that allowing such evidence was error, as the probative value of such evidence was outweighed by the prejudicial effect. Further, relying on our decision in *State v. Young,* 166 W.Va. 309, 273 S.E.2d 592 (1980), *modified on other grounds sub nom. State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991), the Appellant argues that threats by the accused to someone other than the deceased are inadmissible. In contrast, the State contends that the testimony was properly admitted under West Virginia Rule of Evidence 404(b)[16] for the limited and rele-

---

15. We do not find that this error triggers the application of the plain error doctrine. As we stated in syllabus point seven of *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995), to trigger such application "there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 7, 459 S.E.2d at 118. The record reveals

no such error with regard to this evidentiary matter.

16. As discussed *supra* in the prior crimes section of this opinion, the Appellant also failed to argue the applicability of Rule 404(b) before the trial court regarding the introduction of the threat evidence, and does not argue its application on appeal. Therefore, we decline to address the State's contention that the threat evidence was

vant purpose of showing the Appellant's state of mind near the time of the crime and to demonstrate that he was capable of deliberation.

Specifically, the Appellant objected prior to the testimony of William Tippett, the host of the party the Appellant attended just prior to the murder, that when he asked the Appellant to "quiet down," the Appellant responded by saying "I kill or shoot people who tell me to quiet down or shut up." At that point, Mr. Tippett stated that he escorted the Appellant out of his house, only to have him return about thirty to forty minutes later, pounding on the door to get back into the house. Mr. Tippett testified that no one answered the door and that the Appellant left about five minutes later.

The Appellant's specific objection to this evidence was that it was "unduly prejudicial" and that the threat was not directed towards the victim. However, the record is clear that the State offered this testimony to establish the Appellant's mental state approximately two hours prior to the murder. The trial court ruled, prior to the admission of this testimony before the jury, that the evidence was relevant to the Appellant's mental state and specifically found that the evidence was not overly prejudicial. Moreover, the trial court offered a limiting instruction; but the defense indicated it preferred that such an instruction be given as a part of the jury charge. The jury subsequently was instructed with regard to the threat evidence.[17]

■ The Appellant relies upon our decision in *Young* as support for his argument that threat evidence not directed at the victim is inadmissible. *See* 166 W.Va. 309, 273 S.E.2d 592. In syllabus point five of *Young*, we stated that

'[a]s a general rule, an expressed intent of an accused to kill a certain person is not pertinent on his trial for killing another, but it may become pertinent and admissible under circumstances showing a connection between the threat and subsequent conduct of the accused....' Syl. Pt. 2 (in part), *State v. Corey*, 114 W.Va. 118, 171 S.E. 114 (1933).

*Id.* at 310, 273 S.E.2d at 595, Syl. Pt. 5. In the present case, however, the fact that the Appellant raised his mental state at the time the crime occurred through the assertion of the diminished capacity defense constituted a circumstance which showed a connection between the threat evidence introduced and the Appellant's subsequent conduct. *See id.*

Further, we find no abuse of discretion in the trial court's determination that the evidence offered was more probative than prejudicial. As previously stated, the evidence was offered to show that just two hours prior to the murder the Appellant's mental state enabled him to verbalize his resentment at being rebuked, and therefore, indicated that he was capable of forming a malicious state of mind.

## SUFFICIENCY OF EVIDENCE

■ The last issue is whether the trial court erred in not granting the Appellant's motion to direct a verdict of acquittal. The Appellant argues that the only competent expert evidence before the jury regarding his state of mind at the time of the murder was offered by his expert, Dr. Whelan, who opined that the Appellant was not mentally capable of premeditation or deliberation. The Appellant contends that this evidence was "uncontradicted" since the State's expert "was unable to form an opinion as to criminal responsibility, as that was outside of her area of expertise." Thus, the Appellant asserts a trial court can not reject uncontradicted expert testimony as to the elements of the crime. *See Mildred L.M. v. John O.F.*, 192 W.Va. 345, 347, 452 S.E.2d 436, 438 (1994) (holding that "[i]n cases where expert testimony is uncontradicted and the jury rejects it, there must be ample other testimony reasonably supporting the jury's verdict") In

properly admitted at trial pursuant to Rule 404(b).

17. The trial court instructed the jury, without objection that: "You are instructed that there has been evidence of a general threat made by

defendant Floyd DeGraw. You are cautioned that since the threat was not directed toward the victim, the evidence of threat goes only to state of mind of the defendant and not to establish that he acted in conformity with such threat."

274

contrast, the State maintains that the jury was not bound to accept Dr. Whelan's opinion in support of the Appellant's diminished capacity defense in light of the evidence it presented that undermined the basis of that opinion. Further, the State maintains that sufficient evidence was presented to the jury to support his conviction.

▮▮▮▮ We recently established the following new standards for reviewing a sufficiency of the evidence challenge in syllabus points one and three of *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995):

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rationale trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.
>
> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pts. 1 and 3.

The Appellant posits that since the State failed to directly rebut his expert psychiatrist's opinion regarding his state of mind at the time the victim was killed, that opinion was uncontradicted. The record, however, reflects that the State presented its own expert, Dr. Hasan, who did contradict the opinion offered by the Appellant's expert. Dr. Hasan reached a different diagnosis than that offered by the Appellant's expert, finding that the Appellant suffers from major depression rather than bipolar disorder. Further, the doctor testified that the Appellant's self-described manic behavior could have been the result of drug use rather than an inherent mental illness. Moreover, while Dr. Hasan did not testify as to whether the Appellant was criminally responsible because he evaluated him only to determine if he was competent to stand trial, the doctor did raise serious doubt concerning the foundation upon which the Appellant's expert based his opinion. Consequently, the Appellant's expert testimony was contradicted.

Furthermore, we compare this case to our previous case in *Billotti v. Dodrill,* 183 W.Va. 48, 394 S.E.2d 32 (1990) in which the defendant argued that the testimony of lay witnesses regarding the defendant's behavior prior to the crime was inadequate to sustain a finding that the State proved sanity beyond a reasonable doubt when three psychiatrists testified that the defendant did not appreciate the wrongfulness of his acts. *Id.* at 58, 394 S.E.2d at 42. In rejecting the defendant's argument, we concluded that expert testimony may be rebutted by lay testimony. *Id.* (citing *State v. McWilliams,* 177 W.Va. 369, 352 S.E.2d 120 (1986)); *see State v. Walls,* 191 W.Va. 332, 335, 445 S.E.2d 515, 518–19 (1994) (finding sufficient evidence for jury to conclude defendant was sane beyond a reasonable doubt where jury presented with three experts who opined defendant not criminally responsible, but lay witnesses testified that defendant "appeared normal" around time crime committed).

While the *Billotti* decision is instructive, it is not directly on point since the issue before us is not whether lay testimony can be used to rebut an expert's opinion. The decision, however, is supportive of the fact that lay testimony, as well as other evidence, can raise enough doubt about the foundation upon which an expert based his opinion that

the jury may disregard or give little credence to the expert's ultimate opinion.

A review of the record in the instant case clearly establishes that there was sufficient testimony from lay witnesses which called the validity of the expert opinion into question and which otherwise indicated that the Appellant had the mental capability to premeditate and deliberate the victim's murder. First, there was evidence that the Appellant took a knife from his mother's kitchen to the victim's apartment where he forced his way in by climbing through a transom. Then, there were the Appellant's statements to his mother that he had "stabbed" the victim. Moreover, the Appellant's mother's testimony revealed that the Appellant returned home holding her kitchen knife with blood on him. There was evidence that the Appellant had his mother wash his clothes, disposed of the knife, and fled the jurisdiction. Finally, there was the evidence that the Appellant was lucid in describing details of the route he took in fleeing the jurisdiction just hours after he committed the crime.

Consequently, upon a review of the evidence in the light most favorable to the State, there was sufficient evidence for a jury to conclude that the Appellant possessed the requisite state of mind necessary to support a conviction of first degree murder beyond a reasonable doubt. *See Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pt 3. Therefore, we conclude that trial court committed no error in declining to granting the Appellant's motion for a verdict of acquittal.

Having determined that the trial court committed no error with regard to the Appellant's conviction,[18] we hereby affirm the decision of the lower court.

Affirmed.

18. Upon a review of the record, we find the Appellant's assignments of error concerning the trial court's granting of his motion for a change of venue and the admission of testimony concerning footprints found at the crime scene are without merit.