696 S.E.2d 310

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Michael DAY, Defendant Below, Appellant.**

No. 34723.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 13, 2010.

Decided June 18, 2010.

David R. Tyson, Tyson & Tyson, Hunting-
ton, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, R. Christopher Smith, Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

Appellant Michael David Day was convicted by a jury in the Circuit Court of Cabell County, West Virginia, of first-degree murder and conspiracy. By order entered March 1, 2004, he was sentenced to life in prison without the possibility of parole.[1]

In this appeal, Appellant argues his constitutional right to a fair trial was violated by the trial court's admission of testimony by a witness not qualified to testify as a crime scene reconstruction expert; by the State's introduction of certain photographs which were later deemed inadmissible; and by the court's denial of his motion for a jury view.

Upon careful consideration of the petition for appeal, the briefs and argument of counsel and the applicable legal authority, and for the reasons discussed below, we affirm Appellant's conviction and sentence.

I. Factual and Procedural Background

The facts of this case were much disputed at trial. At around dark on June 30, 2002, Appellant and two others, co-defendants Jarrett Bailey and Sunney Freeman, went fishing on the riverbank in Huntington, West Virginia. Approximately one hundred yards from there, Gerald King, a Vietnam veteran, lived at a campsite which he considered to be his home. According to Bailey, Mr. King walked with his dog down to the riverbank where the young men were fishing and drinking beer and asked them whether they had caught any fish and, if they did catch any, he would like to have it. Bailey testified that Mr. King invited them to his campsite to "check it out." Mr. King left and at some point, returned to his campsite.

Thereafter, Frank and Desiree Scarberry, who had been out riding their four-wheeler, stopped by Mr. King's campsite for a brief visit.[2] Mr. and Mrs. Scarberry testified that while they were there, Appellant, Bailey and Freeman approached the campsite and, according to Mrs. Scarberry, the young men asked them if they were cops. Bailey began talking with Mr. Scarberry while Appellant and Freeman looked around the campsite and into Mr. King's tent.[3] At some point, either Appellant or Freeman threw a bottle of beer down on the ground at the campsite. Mr. King asked the young men not to litter because that was his home. Mrs. Scarberry testified that, in response, Freeman began cursing at Mr. King, calling him a "bum" and asking him what he was going to do about it. After a few minutes, Bailey diffused the situation and all three of the young men left the campsite and returned to the riverbank. Mr. and Mrs. Scarberry each testified that they felt uneasy about the young men and although Mr. Scarberry warned Mr. King to be careful of them, Mr. King was not concerned.

For his part, Bailey generally corroborated the Scarberrys' testimony about what occurred at the campsite. Moreover, Mrs. Scarberry positively identified Appellant, Bailey and Freeman from a photographic lineup.[4] However, contrary to the testimony of both Mrs. Scarberry and Bailey, Appellant denied being at Mr. King's campsite while the Scarberrys were there.

According to co-defendant Bailey, the three men returned to the riverbank to fish and drink beer. Bailey testified that Appellant briefly left their fishing spot to use the bathroom and when he returned, he started jumping up and down and, referring to Mr. King, said "Let's go kick his ass." Both Bailey and Freeman agreed to go to Mr. King's campsite.

---

1. Appellant was seventeen years old when the events described herein transpired. According to Appellant, upon motion by the State, he was transferred from the jurisdiction of the juvenile court to the adult criminal division of the Circuit Court of Cabell County by order entered December 12, 2002.

2. Mr. Scarberry testified that he had previously visited Mr. King on several occasions.

3. Mr. King's campsite had, among other things, a tent and picnic table, a large fire pit, smoker, tiki torches and a mailbox. According to Mr. Scarberry, Mr. King had even laid gravel for a parking lot for visitors' four-wheelers.

4. Mr. Scarberry was unable to positively identify Appellant from a photographic lineup. However, he identified both Bailey and Freeman.

In contrast to Bailey's testimony, Appellant testified that it was Freeman who left the fishing spot to go into the woods to use the bathroom and to get some firewood. According to Appellant, while Freeman was gone, Appellant and Bailey heard him scream, at which time Bailey began running up the trail in the direction of Mr. King's campsite. Appellant stated that he did not follow right away because he had a fish or snag on the line. A few minutes later, however, he heard a loud noise and began to run up the trail towards the campsite. Appellant testified that along the way, he picked up a long stick.

When the three men arrived at the campsite, it was after dark. Bailey's and Appellant's versions of what next occurred were quite different;[5] however, the tragic ending was the same—the violent death of Mr. King.

Bailey testified that he saw Freeman confront Mr. King in front of his tent where the two exchanged words. According to Bailey, Freeman told Mr. King "he was going to kick his ass." Freeman then proceeded to hit Mr. King in the face with his fist. Mr. King fell to the ground where Freeman put him into a headlock. Freeman hollered for Bailey to "get ahold of him," at which time Bailey held Mr. King in a headlock while Freeman and Appellant began kicking him. When Bailey got up off of Mr. King for fear of being kicked, Mr. King started to get up, too, but Freeman hit him on the head with a beer bottle so hard that it broke.[6] When Mr. King fell to the ground, the men continued kicking him and, according to Bailey, Appellant took a stick, which Bailey described as a thick tree branch, "and started hitting [Mr. King] in the sides with it, in the arms and stuff."

Bailey admitted that he used an aluminum-like mop handle as a weapon, hitting Mr. King with it so hard that it bent. Though Bailey testified he then threw it over the embankment, police never recovered it. He then picked up a bamboo stick and hit Mr. King with it until it frayed. Bailey then saw Freeman take out his knife, open it, and stab Mr. King in the leg. Freeman then closed the knife and threw it towards the river. According to Bailey, when he saw Freeman's hand bleeding heavily, he took off his shirt and gave it to him to wrap it up. At about that time, William Porter[7] came up behind Bailey swinging a six-foot long stick and the two men began fighting. Bailey testified that he chased Mr. Porter around in an effort to get the stick that he had been swinging and they eventually ended up fighting at Mr. Porter's campsite. While he was fighting with Mr. Porter, Bailey saw Appellant close to the embankment, standing over Mr. King, who was lying on the ground. Appellant hit him in the head with the tree branch. According to Bailey, Appellant swung the branch "[k]ind of over his head and down" at least twice and Bailey "could hear the hit, like it sounded painful." Meanwhile, Bailey could see Freeman hitting Mr. Porter with "a two-by-six" in the head in another area of the campsite. Bailey took the stick he had taken from Mr. Porter and hit him with it.

Bailey testified that he could hear Appellant and Mr. King over the embankment and when he walked down the embankment, he saw Appellant stomping Mr. King in the chest and head while Mr. King was lying on the ground. It was then that Bailey yelled to Appellant, "Let's go. Let's get out of here." Bailey testified that when the three men left, Mr. King was still alive.

5. Bailey agreed to testify against Appellant at trial. In exchange, Bailey was to plead guilty to the voluntary manslaughter of Mr. King and the malicious wounding of William Porter, a homeless man who occupied a smaller campsite just next to Mr. King's. Apparently, Mr. Porter happened upon the melee and tried to assist Mr. King. Mr. Porter was also severely beaten but survived.

Originally, all three men were indicted on the charge of malicious wounding with respect to Mr. Porter. Based upon Bailey's version of what transpired, the malicious wounding charge against Appellant was eventually dismissed. *See* Discussion, *infra*.

It is unclear from the record whether and on which charges Freeman's case went to trial or if he entered into a plea agreement.

6. Though Bailey testified that he believed the beer bottle broke after Freeman hit Mr. King with it, the police did not find a broken bottle at the scene during its investigation.

7. *See* n. 5, *supra*.

In sharp contrast, Appellant testified that the entire altercation with Mr. King and Mr. Porter lasted no longer than three to four minutes and occurred much differently than Bailey described. According to Appellant, as he walked toward the campsite, he saw Mr. King as he "rose up out of the trail. Apparently he had already got knocked down." Appellant testified that Freeman was bent over and screaming that he had been cut. Appellant then saw a shadow (which turned out to be Mr. King's) and "swung the stick and hit him in the upper part of the body which could be head, shoulders, chest, somewhere around this side or the opposite." Appellant admitted that he may have struck Mr. King in the throat. Contrary to Bailey's testimony, it was Appellant who wrapped his shirt around Freeman's bleeding hand. Though Bailey had been fighting with Mr. Porter, he then attacked Mr. King. Appellant testified that Mr. King was over towards the embankment and that Bailey knocked him off to the ground five feet below.

Appellant admitted that he jumped over the embankment and kicked Mr. King a few times but that Bailey had him in a choke hold "standing up." Appellant testified that he then told Bailey, "He is not even fighting no more. He is done with." To this, Bailey replied, "I have just got him in a choke hold." Appellant went to climb back up the embankment and told Bailey "to come on or I am leaving him[.]" All three men left the scene and returned to the riverbank. Appellant testified that when they left, Mr. King was alive and hollering after them.

After the three men retrieved their belongings from the riverbank, they began walking home. On their way, they stopped by a parking lot where trial witnesses Lidia Miles and Mary Ann Travis, along with several other people, were letting off fireworks. Ms. Miles and Ms. Travis testified that all three men had blood on their clothing and that Appellant was "bragging" about the fight they had just been in. According to both witnesses, Appellant stated that they

"may have killed that one dude." Ms. Travis further testified that she helped Freeman wrap his injured hand. She further testified that Freeman told her he wanted to return to the riverbank to retrieve his knife but she urged him not to go back.

According to Appellant, he never entered the parking lot where Ms. Miles and Ms. Travis were setting off fireworks, but stayed across the street and waited there for Freeman and Bailey. He testified further that he never spoke to Ms. Miles, Ms. Travis or anyone there about what had just occurred at the riverbank.

The three men proceeded to Bailey's house where they burned their bloodied clothing. Appellant and Freeman then returned to Appellant's home and fell asleep on the couch. According to Appellant, Bailey came to his home the next day and told him that he and Freeman had returned to the riverbank but that Mr. King and Mr. Potter were not there.[8] As discussed in more detail below, it was Appellant's theory at trial that, in fact, Bailey and Freeman returned to the murder scene where Mr. King was still alive; killed him; and carried his body to the river's edge where it was eventually found.[9] Appellant further argued that this explains why certain objects described by Bailey as having been used in the attack were not recovered by police or were found seemingly out of place at the crime scene; Appellant contended they were moved or removed by Bailey and Freeman.

At trial, Dr. Hamada Mahmoud, Deputy Chief Medical Examiner for the State of West Virginia and an expert in forensic pathology, testified that Mr. King sustained numerous contusions and abrasions over his legs, arms and trunk as a result of repeated blunt force trauma. According to Dr. Mahmoud, the blunt force objects causing Mr. King's external injuries could have been caused by items such as sticks, poles or wood planks, or by feet that had stomped or kicked Mr. King's body. Dr. Mahmoud also testified that Mr. King suffered incised wounds to

8. Appellant testified that, at the time, he did not believe Bailey's claim that he and Freeman had returned to the riverbank because Freeman had been asleep on the couch next to Appellant.

9. The day following the attack, Mr. Scarberry returned to the campsite to check on Mr. King. He found his dead body lying along the river's edge.

his right thigh and left elbow from either a knife or other sharp object. While the external injuries to Mr. King were quite severe, he ultimately died from his internal injuries. According to Dr. Mahmoud, Mr. King sustained subdural and subarachnoid hemorrhages caused from blunt force trauma to the head (perhaps repeated blows) and a broken thyroid cartilage on the left side of the neck. Dr. Mahmoud indicated the broken cartilage could have been caused by a blow to the throat. He further testified that death would not necessarily have been immediate and that Mr. King could have survived up to a few hours after the beating; could have gotten up; and could have moved to a nearby location before he collapsed and died.

Sgt. David Castle, Supervisor of the Huntington Police Department's Crime Scene Unit and one of the investigating officers, testified at trial as an expert in crime scene investigation and reconstruction. He had previously prepared a Crime Scene Follow-Up Report, which summarized his testimony regarding the investigation [10] and was admitted into evidence. Using photographs he took of the crime scene, Sgt. Castle testified regarding specific items which were found damaged and strewn about Mr. King's campsite and other items which were found bloodstained.[11] Specifically, Sgt. Castle testified that police recovered, among other things, a long wooden stick with bloodstains and a thin bamboo tiki-torch pole with frayed ends and bloodstains consistent with it having been used as a weapon. Sgt. Castle further testified that a partially charred two-by-six piece of lumber was found. It was identified by co-defendant Bailey as the board used by Freeman to strike Mr. Porter.

Consistent with Bailey's testimony, Sgt. Castle opined that the attack began in Mr. King's campsite outside of his tent because so many objects were knocked over in that area. He testified that "there were some bloodstains on the ground up there that also indicated to us that someone had a bleeding injury and they were elevated above the ground. Blood was dripping and dropping on to the ground." Sgt. Castle stated that the long stick and bamboo pole with frayed ends found at Mr. King's campsite were used as weapons. Low velocity bloodstains were also found on a root system over in the embankment area which, according to Sgt. Castle, were probably from someone who was lying down because the topography would have precluded someone from standing in the root system. Sgt. Castle further testified that the amount of bloodstains below the root system in the embankment area had medium velocity stains indicating blood spatter occurring while blows were being struck.

Sgt. Castle further opined that Mr. King ended up over the embankment [12] to the area below where he was later beaten on the ground. According to Sgt. Castle the majority of the blows were struck over the embankment based upon the amount and types of bloodstains found, the weapons discovered there, and the disturbance of the soil.

According to Sgt. Castle, the struggle that occurred in Mr. Porter's campsite appeared not to have been continued from the other areas, but was separate, because there was less blood and less disturbance of objects in the area. Sgt. Castle testified that the testimony of co-defendant Bailey regarding the attacks on Mr. King and Mr. Porter were consistent with his investigation and reconstruction.

## II. Discussion

### Expert testimony

■ In his first assignment of error, Appellant argues that the trial court should

---

10. Sgt. Castle indicated that because the crime scene was so large, it was divided into quadrants for purposes of investigation: Mr. King's campsite; the area below the embankment, which was located approximately five feet below Mr. King's campsite; Mr. Porter's campsite, which was located sixty to seventy feet west of Mr. King's campsite; and the river's edge, which was located north of Mr. Porter's campsite and which was where Mr. King's body was discovered.

11. Sgt. Castle indicated that he had been at Mr. King's campsite three weeks before the murder, at which time it was neat and well-organized. In the Crime Scene Follow-Up Report, Sgt. Castle described Mr. King's campsite as having been "ransacked during the course of a struggle" and, indeed, his testimony and the photographs taken just following the murder were consistent with this description.

12. Sgt. Castle opined Mr. King was either pushed or tried to get away.

have excluded the testimony of Sgt. David Castle because he was never qualified to testify as a "crime scene reconstruction expert." However, the State contends that Appellant waived this argument by expressly assenting to Sgt. Castle's qualifications as a crime scene investigation and reconstruction expert. We agree.

 This Court has held that " '[w]hen there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined.' Syl. Pt. 8, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995)." Syl. Pt. 1, *State v. White*, 223 W.Va. 527, 528, 678 S.E.2d 33, 34 (2009). Indeed, " 'to establish waiver there must be evidence demonstrating that a party has intentionally relinquished a known right.' *Potesta v. U.S. Fidelity & Guar. Co.*, 202 W.Va. 308, 315, 504 S.E.2d 135, 142 (1998)." 223 W.Va. at 530, 678 S.E.2d at 36.

As indicated above, Sgt. Castle was one of the police officers who investigated the crime scene after the attacks occurred. At trial, Sgt. Castle described his extensive education and training in crime scene investigation and reconstruction and indicated that he has previously been qualified in Cabell County as an expert in those fields. Thereafter, when the

State requested that Sgt. Castle be qualified as an expert in "crime scene investigation" and "crime scene reconstruction," counsel for Appellant [13] stated, "Based upon his experience and training and many times being qualified, I have absolutely no objection to his qualifications as a crime scene expert." Quite clearly, Appellant knowingly and intentionally waived any objection to Sgt. Castle's qualifications as an expert in crime scene investigation and reconstruction. Thus, Appellant's contention that Sgt. Castle's testimony was inadmissible because he was never qualified as a crime scene reconstruction expert is without merit.

██ Appellant also argues that Sgt. Castle's testimony was inadmissible because the State failed to provide a summary of his qualifications, opinions, bases and reasons therefor, in advance of trial, as required by West Virginia Rule of Criminal Procedure 16(a)(1)(E). [14] Again, upon careful review of the record, including the context in which Appellant argued that certain testimony by Sgt. Castle violated Rule 16, we find no merit to Appellant's argument. [15]

As indicated above, when the State moved to qualify Sgt. Castle as a crime scene investigation and reconstruction expert, Appellant stated he had "absolutely no objection" to Sgt. Castle's qualifications. Thus, as we con-

---

**13.** We note that Appellant is represented by different counsel in this appeal.

**14.** West Virginia Rule of Criminal Procedure 16(a)(1)(E) provides:

(a) *Disclosure of evidence by the state.*—(1) Information subject to disclosure.—(E) Expert witnesses.—Upon request of the defendant, the state shall disclose to the defendant a written *summary of testimony the state intends to use* under Rules 702, 703, or 705 of the Rules of Evidence during its case in chief at trial. The summary must describe the witnesses' opinions, the bases and reasons therefor, and the *witnesses' qualifications.*

**15.** In this appeal, Appellant argues very generally that the State violated W.Va. R.Crim. Pro. 16(a)(1)(E) by failing to provide notice of Sgt. Castle's expert testimony and qualifications. However, our review of the record reveals that Appellant's Rule 16 objection was not made until after the last question was asked on direct examination of Sgt. Castle (that is, after Sgt. Castle had already testified for 102 pages). West Virginia Rule of Evidence 103(a)(1) " 'requires that, to

preserve for appellate review an objection to evidence, the objection must be "(1) specific, (2) timely, and (3) of record." ' " *State v. Simons*, 201 W.Va. 235, 240 n. 8, 496 S.E.2d 185, 190 n. 8 (1997) (*quoting United States v. Parodi*, 703 F.2d 768, 783 (4th Cir.1983) (internal citation omitted)) (quoting 21 Wright & Graham, Federal Practice & Procedure § 5036, at 174 (1977 ed.)) (emphasis added). "Indeed, ' "[t]imeliness of objection under the Rule requires that it 'be made at the time the evidence is offered ....' " ' (citations omitted)." 201 W.Va. at 240 n. 8, 496 S.E.2d at 190 n. 8. Thus, any argument by Appellant that the entirety of Sgt. Castle's testimony was inadmissible for lack of notice under Rule 16(a)(1)(E) was untimely and was, therefore, waived. As discussed in more detail below, Appellant was provided with the Crime Scene Follow–Up Report written by Sgt. Castle, which summarized in some detail Sgt. Castle's trial testimony. Indeed, Sgt. Castle's direct examination testimony closely followed the report. Appellant made a Rule 16 objection when Sgt. Castle testified beyond the scope of the report. *See* Discussion *supra*. Accordingly, we address Appellant's assignment of error in that context.

cluded above, Appellant waived the argument that Sgt. Castle's testimony was inadmissible because he was not given notice of Sgt. Castle's qualifications as an expert under Rule 16(a)(1)(E).

■ We next address Appellant's argument that the State violated Rule 16(a)(1)(E) by failing to provide notice of Sgt. Castle's expert testimony. As previously indicated, in advance of trial, Sgt. Castle completed a Crime Scene Follow–Up report in which he described what he and other officers observed at the crime scene; what objects were found and where; and what tests were subsequently performed on various items in an effort to identify bloodstain sources and fingerprints. The record reveals that Sgt. Castle testified at length about the investigation and the conclusions and opinions drawn therefrom. Near the end of his direct examination, the State inquired whether Sgt. Castle had an expert opinion as to why police were unable to find the beer bottle co-defendant Bailey claimed broke when Freeman used it to hit Mr. King in the head. Appellant's counsel made the following objection: "Well, what is this opinion to be derived on, your Honor?" Out of the presence of the jury, Sgt. Castle responded to the question, stating that, in his opinion, someone may have gone to the crime scene and picked up the broken bottle. The trial court determined that Sgt. Castle would not be permitted to answer the question in front of the jury. The trial court stated the following:

> There is testimony it was darkness. There was no testimony about anybody having any flashlights or anything. He thought that bottle broke, and I cannot imagine them going back and picking up a bottle with all this happening. I am not going to let him say that.

■ Immediately thereafter, Appellant's counsel made another objection:

Judge, I—my problem with this whole line goes way beyond that.... If Sergeant Castle, Your Honor, has expert opinion as to something that happened that night and he has shared that expert opinion with Mr. Chiles, which he has said he has, we feel that that is potentially exculpatory expert witness opinion that should have been disclosed to the defense pursuant to *Brady*.

It's a *Brady* violation. *It's a Rule 16 violation.*[16]

(Emphasis and footnote added)

The trial court overruled Appellant's objection. Thereafter, despite the trial court's ruling precluding this testimony by Sgt. Castle, Appellant's counsel proceeded to cross examine him about the fact that the police were unable to recover the broken beer bottle about which Bailey testified. Specifically, Appellant's counsel asked:

> Do you have any explanation, theory, or opinion—you can tell us which one—as to why we are not seeing broken beer bottles?

Sgt. Castle responded as follows:

> Well, there would be two explanations— two possible explanations. One obviously would be that Mr. Bailey is wrong, he is mistaken, the bottle didn't break. Or, two, the theory would be that someone picked it up, took it—the pieces of broken beer bottle and removed them from the scene.

Appellant's counsel further questioned Sgt. Castle as to his expert opinion regarding other objects found by police in one area of the crime scene but described by Bailey as having been used as weapons in other areas. Sgt. Castle responded that the objects could have been thrown or moved from one place to another. Later, during his closing statement, Appellant's counsel argued the theory that Freeman and Bailey (but not Appellant) returned to the scene after the fact. He argued, in part, as follows:

> Appellant accepted Sgt. Castle as an expert in that field when he could have, instead, taken the opportunity to *voir dire* the witness as to his qualifications. Thus, Appellant knowingly and intentionally relinquished his right to *voir dire* Sgt. Castle and has waived this argument on appeal. *White*, at syl. pt. 1.

---

16. In a confusing turn of events, Appellant also argued during the course of this objection that he was not given "a chance to voir dire [Sgt. Castle] on his expertise as a reconstruction—his qualifications as to reconstructions." Appellant also raises this argument on appeal. As previously set forth, the record clearly demonstrates that

I mean, we have got lots of, you know, missing pieces and things that don't fit; don't we? You know? Where is that knife Jarrett Bailey said he saw? Did it get thrown in the river? He said he saw it thrown in the river; didn't he? Well, when? When? Not the first time. Michael [Appellant], another witness, never saw any knife. Why? Because it didn't happen then. It happened later, later that night. They went back down there, the two of them. Went back down there and cleaned up the scene.

Who knows what else they did? Hey, do you want to believe Jarrett Bailey that he [Appellant] inflicted all of these blows? Do you want to believe he inflicted all of these blows? Add them up. You took notes on his testimony. Add up the number of blows. Add up the number blows that the Medical Examiner said was there. Does it add up? No.

How could it add up? They [Freeman and Bailey] go back down there and start it up again. Start it up again without Michael [Appellant]. He tried. He told you the truth. 'I made statements. I am telling you the truth.' He didn't know [Freeman] and Bailey went back down there. He had a clue, but he didn't think it was true.

Mary Travis told us that. Chris Chiles acknowledges it could have happened, and that could explain some things.

Also, wouldn't it also make sense that if somebody went back down there to clean up their mess there is [Mr. King's] body—or maybe he is alive, maybe he is not. I don't know. I wasn't there.—they took [Mr. King's] body and dragged it down to the river and dumped it in the river?

As indicated above, Appellant initially objected to Sgt. Castle's expert opinion testimony regarding what may have occurred to explain the fact that no broken beer bottle was found at the scene [17] as, *inter alia*, a violation of Rule 16(a)(1)(E). It is his contention that because he was not provided notice of Sgt. Castle's expert opinion in this regard, as required by Rule 16(a)(1)(E), his opinion was inadmissible. However, as recounted above, it is clear that following his objection and the court's ruling, Appellant proceeded to question Sgt. Castle on the very issue to which he objected and, indeed, relied upon Sgt. Castle's testimony as part of the theory of his case.

■ This Court has held that "[w]here a party objects to incompetent evidence, but subsequently introduces the same evidence, he is deemed to have waived his objection." Syl. Pt. 3, in part, *State v. Smith*, 178 W.Va. 104, 106, 358 S.E.2d 188, 190 (1987). We have further determined that

' "Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous [ruling] and then later seeking to profit from that error. The idea of invited error is ... to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a later stage of the [proceedings] use the error to set aside its immediate and adverse consequences.'

*Roberts v. Consolidation Coal Co.*, 208 W.Va. 218, 228, 539 S.E.2d 478, 488 (2000) (*quoting State v. Crabtree*, 198 W.Va. 620, 627, 482 S.E.2d 605, 612 (1996)). *Accord In re Tiffany Marie S.*, 196 W.Va. 223, 233, 470 S.E.2d 177, 187 (1996) ("[W]e regularly turn a deaf ear to error that was invited by the complaining party." (citation omitted)); *Shamblin v. Nationwide Mut. Ins. Co.*, 183 W.Va. 585, 599, 396 S.E.2d 766, 780 (1990) (finding "the appellant cannot benefit from the consequences of error it invited").

Accordingly, because the error about which Appellant complains was "invited error," this assignment of error was waived.

*Photographs of the campsite*

■ The second issue for our review is whether the trial court improperly denied

---

**17.** It is unclear why Appellant objected to this particular testimony by Sgt. Castle as it bolstered Appellant's theory that Bailey and Freeman returned to the crime scene and killed Mr. King after the three men had left him alive over the embankment.

Appellant's motion for mistrial based upon the fact that the State introduced photographs of the campsite which pre-dated the murder by more than one year and which, for that reason, were later deemed inadmissible.

During its opening statement, the State showed to the jury several black and white photographs of Mr. King's campsite. The purpose of the photographs was to demonstrate to the jury that Mr. King took pride in the home he made for himself on the riverbank; that he kept it neat, orderly and organized; and that the campsite's normal appearance sharply contrasted the destruction and disarray depicted in photographs taken by the police following Mr. King's murder.

After the photographs were introduced, Gregory Behan, a lawyer and the amateur photographer who took them, testified that he first met Mr. King in early 2001 during the course of his representation of a criminal defendant in an unrelated case. Mr. Behan befriended Mr. King and returned to his campsite three times to take photographs of it. Mr. Behan testified that each time he returned to the campsite, "[i]t was pretty much the same. I mean there would be some times where he would have found some stuff along the river that he would have piled up as far as lumber to use, but other than that it was generally the same.... Always neat." According to Mr. Behan, the photographs were taken in March 2001, more than one year before Mr. King's murder, a fact of which the State was unaware until Mr. Behan's trial testimony.

Mr. Scarberry, like Mr. Behan, testified that whenever he visited Mr. King's campsite—including the evening of the murder—it was always neat and well maintained. The Stated then moved for the admission of the above-described photographs. The trial court denied the State's motion on the ground that, because the photographs were taken well before the murder, they could not be used to demonstrate how the campsite appeared just prior to the murder. Appellant subsequently moved for a mistrial on the ground that the jury had been shown the inadmissible photographs. The trial court, however, concluded it was harmless error

and denied Appellant's motion. We agree with the trial court's ruling.

In past cases, this Court has held that "[t]he decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court." Syl. Pt. 8, *State v. Davis*, 182 W.Va. 482, 483, 388 S.E.2d 508, 509 (1989). *See State v. Armstrong*, 179 W.Va. 435, 443, 369 S.E.2d 870, 878 (1988); *State v. Williams*, 172 W.Va. 295, 304, 305 S.E.2d 251, 260 (1983). Furthermore, this Court has set forth the "harmless error" test to determine whether the introduction of improper evidence in some instances does not constitute reversible error:

'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.' Syllabus point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979).

Syl. Pt. 7, *State v. Doonan*, 220 W.Va. 8, 11, 640 S.E.2d 71, 74 (2006). *See* Syl. Pt. 4, *State v. Rahman*, 199 W.Va. 144, 483 S.E.2d 273 (1996); Syl. Pt. 3, *State v. Maynard*, 183 W.Va. 1, 2, 393 S.E.2d 221, 222 (1990). *See also State v. Potter*, 197 W.Va. 734, 748, 478 S.E.2d 742, 756 (1996) ("Our cases consistently have held that nonconstitutional errors are harmless unless the reviewing court has grave doubt as to whether the erroneously admitted evidence substantially swayed the verdict.")

Thus, under *Doonan*, we must first determine if, absent the inadmissible photographs, the remaining evidence was sufficient to convince the jury of Appellant's guilt beyond a reasonable doubt. We conclude that it was.

The evidence at the heart of the murder and conspiracy charges included testimony from co-defendant Jarrett Bailey who testified that it was Appellant who initially wanted to go "kick [Mr. King's] ass." Bailey testified that Appellant hit Mr. King in the head with a thick tree branch, swinging it "[k]ind of over his head and down" at least twice and so hard Bailey "could hear the hit, like it sounded painful." Bailey further testified that he saw Appellant stomping Mr. King in the chest and head while he was lying on the ground over the embankment. According to Dr. Mahmoud, Mr. King ultimately died from subdural and subarachnoid hemorrhages and a broken left thyroid cartilage probably caused when Appellant struck Mr. King in the neck. Dr. Mahmoud also testified that Mr. King could have survived long enough to move himself from the location where he was last beaten to the rivers edge where his dead body was found the following day.

Furthermore, according to the trial testimony of Mary Ann Travis and Lidia Miles, Appellant later bragged about the attack and declared that he and the other men may have killed "that one dude," clearly referring to Mr. King.

Based upon the evidence adduced at trial, we find that, absent the inadmissible photographs, the remaining evidence was more than sufficient to convince a jury of Appellant's guilt of first degree murder and conspiracy beyond a reasonable doubt. Having so concluded, the test in *Doonan* requires this Court to next analyze whether the introduction of the inadmissible photographs during its opening statement had any prejudicial effect on the jury. We conclude there was no prejudice.

As indicated above, the purpose of the pre-murder photographs was to demonstrate to the jury that the campsite where Mr. King made his home ordinarily appeared neat and orderly and sharply contrasted the crime scene photographs which showed various items knocked over and strewn about the campsite and either broken or bloodstained or both, thus showing that a violent attack had occurred there. Though ruled inadmissible because they were taken more than one year before the murder, the essence of the photographs was reflected in the testimony of Mr. Scarberry, who had visited Mr. King at the campsite only hours before the murder. He testified as to the neat, orderly and well-maintained appearance of Mr. King's campsite that evening and each time he had visited it previously. Moreover, later in the trial, Sgt. Castle also testified that he had been to Mr. King's campsite approximately three weeks before his murder and found it to be neat and well-organized and distinctively different than the way it appeared following the murder.

Because the admissible testimony of Mr. Scarberry and Sgt. Castle described for the jury what the inadmissible photographs visually conveyed—that Mr. King normally kept his campsite neat, clean and orderly—we conclude that the introduction of the photographs had no prejudicial effect on the jury's verdict.

Based upon the above, under the test set forth in *Doonan*, introduction of the inadmissible photographs was harmless error.

*Jury View*

▮ Appellant's next assignment of error is that the trial court improperly denied his motion for a jury view of the crime scene. Appellant argues a jury view would have allowed the jury to "orientate itself to the physical, geographical and weather conditions present at the time of the alleged events." According to Appellant's brief, he testified at trial that "he could not see the initial altercation between Freeman and Gerald King. By viewing the crime scene, the jury would have a better understanding of the Appellant's view, when by his testimony he heard Freeman scream and could not see the actual altercation."[18]

18. Appellant also argues that a jury view should have been permitted so as to minimize the prejudicial effect of the inadmissible campsite photographs described above. As we have already concluded, introduction of the inadmissible photographs was in no way prejudicial and was harmless error under the test set forth in *Doonan*. Thus, we need not address Appellant's argument that a jury view would have minimized any alleged prejudicial effect of the pre-murder campsite photographs.

At trial, however, Appellant's motion for a jury view was based upon grounds other than those argued in this appeal. Following co-defendant Bailey's testimony, he accompanied one of the investigating officers to the crime scene for the purpose of showing him exactly where the three men had gone fishing; the officer then measured the distance from the fishing spot to Mr. King's campsite. The following day, Detective Richard Knight testified that, based upon the measurement, the distance was approximately one hundred and ten yards.[19] Thereafter, following direct examination of Sgt. Castle, Appellant made an oral request for a jury view,[20] arguing as follows:

"[b]ecause they sent their witness, Jarrett Bailey, along with a police officer and two lawyers, back down to the scene yesterday—

Trial Judge: To take one measurement.

Appellant's Counsel: And both of them testified—

Trial Judge: To take one measurement, and your guy can go down tonight and measure it if he wants to, come back and testify differently.

Appellant's Counsel: There must be a reason for it, Your Honor.

Trial Judge: We are going to—

Appellant's Counsel: And it's contrary to the evidence that has been previously taken in this case regarding the condition of the riverbank and what they were able to find. So I am renewing my motion.

Trial Judge: Overruled.

In *State v. DeGraw*, 196 W.Va. 261, 272, 470 S.E.2d 215, 226 (1996), this Court explained that

'West Virginia Rule of Evidence 103(a)(1) provides, in pertinent part, that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, *stating the specific ground of objection*, if the specific ground was not apparent from the context...." Id. (emphasis added). In interpreting the significance of Rule 103(a)(1), Justice Cleckley in his Handbook on Evidence for West Virginia Lawyers states: "the objecting party should not benefit from an insufficient objection if the grounds asserted in a valid objection could have been obviated had the objecting party alerted the offering party to the true nature of the objection." 1 Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 1–7(C)(2) at 78 (3rd ed. 1994); *see Leftwich v. Inter–Ocean Casualty Co.*, 123 W.Va. 577, 585–86, 17 S.E.2d 209, 213 (1941) (Kenna, J., concurring) ("It is well established that *where the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified*."); 1 Jack B. Weinstein et al., Weinstein's Evidence ¶ 103[02] at 103–37 (1995) (stating that "*a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal*").'

---

19. We note that neither Appellant nor the State provides any explanation in their appellate briefs, nor is it readily apparent from the record, as to why it was necessary to ascertain the distance between the fishing spot and the campsite during the course of the trial.

20. Prior to trial, Appellant filed a written Motion for a Jury View, in which he argued, in relevant part, that it is

absolutely crucial to the defendant's case that the Jury understand and appreciate the crime scene as it presented itself to the defendant on June 30, 2002; the trial is set for July 8, 2003, fifty-three weeks after the incident. It is the same season (summer) of the year, approxi-

mately the same amount of daylight and the same physical, geological and environmental conditions as were present on June 30 and July 1, 2002.

The argument set forth in the foregoing written motion was specifically based upon the fact that the trial was to begin on July 8, 2003. However, the record reflects that the trial date was rescheduled several times and was finally conducted beginning on September 9, 2003. We note that neither Appellant nor the State make any reference to this written motion and, further, it is unclear from the record whether the trial court ever entered an order denying it.

(Emphasis added) *See Finley v. Norfolk and Western Ry. Co.*, 208 W.Va. 276, 282, 540 S.E.2d 144, 150 (1999) (" 'Only those objections or grounds of objection which were urged on the trial court, without change and without addition, will be considered on appeal.' 4 C.J.S. Appeal and Error § 216.")

Consistent with the requirements of Rule 103(a)(1), we have steadfastly held to the rule set forth in syllabus point 3 of *Voelker v. Frederick Business Properties Co.*, 195 W.Va. 246, 248, 465 S.E.2d 246, 248 (1995), that " ' "[i]n the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken." Syllabus Point 1, *Mowery v. Hitt*, 155 W.Va. 103[, 181 S.E.2d 334] (1971).' Syl. pt. 1, *Shackleford v. Catlett*, 161 W.Va. 568, 244 S.E.2d 327 (1978)." *See Hartwell v. Marquez*, 201 W.Va. 433, 442, 498 S.E.2d 1, 10 (1997) (" 'It is a well established principle that this Court will not decide nonjurisdictional questions which have not been raised in the court below.' "*(quoting Stonebraker v. Zinn*, 169 W.Va. 259, 266, 286 S.E.2d 911, 915 (1982) (additional citations omitted))); Syl. pt. 2, *Trent v. Cook*, 198 W.Va. 601, 602, 482 S.E.2d 218, 219 (1996) (" '[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review.' Syl. Pt. 6, in part, *Parker v. Knowlton Const. Co., Inc.*, 158 W.Va. 314, 210 S.E.2d 918 (1975).")

Accordingly, Appellant's argument that the trial court improperly denied his motion for a jury view was not properly preserved and will not be considered in this appeal.

### III. Conclusion

Based upon all of the above,[21] Appellant's conviction in the Circuit Court of Cabell County of first degree murder and conspiracy and the sentence of life in prison without the possibility of parole are affirmed.

Affirmed.

21. In addition to the assignments of errors addressed herein, Appellant raises a very general allegation of juror bias on the part of Juror Jennifer Bowles. Appellant argues that Juror Bowles "recognized" two of Appellant's immediate family members but failed to notify the trial court. Appellant further avers that during a post-trial hearing on the juror bias issue, he proffered testimony of one Heather Farnsworth, "who the Appellant believes would have testified that she overheard [Juror Bowles] discussing the case and the Appellant while visiting an inmate in jail." (Upon review of the record, it appears that Ms. Farnsworth was subpoenaed to testify at the hearing but failed to appear; it further appears that no steps were taken to compel her to testify.)

Unfortunately, Appellant's argument on appeal is considerably vague and fails to include supporting facts or any legal authority. "In the absence of supporting authority, we decline further to review this alleged error because it has not been adequately briefed." *State v. Allen*, 208 W.Va. 144, 162, 539 S.E.2d 87, 105 (1999). As we stated in *State, Dept. of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), " '[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim.... Judges are not like pigs, hunting for truffles buried in briefs.' " *(quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Furthermore, this Court has adhered to the rule that "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are not raised, and *those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal*." *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996). *Accord State v. Adkins*, 209 W.Va. 212, 216 n. 5, 544 S.E.2d 914, 918 n. 5 (2001); *State v. Easton*, 203 W.Va. 631, 642 n. 19, 510 S.E.2d 465, 476 n. 19 (1998); *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) (noting that "appellate courts frequently refuse to address issues that appellants ... fail to develop in their brief."). *See also Ohio Cellular RSA Ltd. Partnership v. Board of Pub. Works of West Virginia*, 198 W.Va. 416, 424 n. 11, 481 S.E.2d 722, 730 n. 11 (1996) (refusing to address issue on appeal that had not been adequately briefed).

Though Appellant failed to adequately brief the alleged juror bias argument, we have, nevertheless, carefully reviewed the record thereon, including the post-trial hearing transcripts; the jail visitation logs; and the February 26, 2004, letter from Christopher D. Chiles, Prosecuting Attorney, to Hon. Alfred E. Ferguson, Judge. This Court's ability to review a claim of ineffective assistance of counsel is limited on direct appeal; however, such a claim would be more appropriately developed in a petition for writ of *habeas corpus*. *See* Syl. Pt. 11, *State v. Garrett*, 195 W.Va. 630, 634, 466 S.E.2d 481, 485 (1995).